

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

ENTERED
02/01/2017

| | |
|---|---|
| IN RE | ) |
| | ) |
| WINDMILL RUN ASSOCIATES, LTD., | ) CASE NO. 15-80319-G3-11 |
| | ) |
| Debtor, | ) |
| | ) |
| WINDMILL RUN ASSOCIATES, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) ADV. NO. 15-8013 |
| | ) |
| FEDERAL NATIONAL MORTGAGE | ) |
| ASSOCIATION, AND OAK GROVE | ) |
| COMMERCIAL MORTGAGE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION

The court has held a joint trial on the above captioned adversary proceeding, and in the instant Chapter 11 case, the "Amended Motion for (I) Allowance of Secured Claim and Reasonable Fees, Costs, and Charges Pursuant to 11 U.S.C. § 506(b) and Fed. R. Bankr. P. 2016 and (ii) Estimation of Future Costs Pursuant to 11 U.S.C. § 502(c)" (the "506(b) motion") (Docket No. 279, amending Docket No. 276, Case No. 15-80319-G3-11).

### Introduction

Part of the statutory mandate of the Federal National Mortgage Association (generally known as "Fannie Mae") is to encourage investment in construction and management of low to middle income housing. See 12 U.S.C. § 1716(c). This

encouragement is created through tax credits, administered for
the United States Department of Housing and Urban Development by
each state's allocating agency.  These properties financed
through Low Income Housing Tax Credits ("LIHTC") are ordinarily
marketed to groups composed of financial institutions and
individual investors seeking the specified tax benefit.  The
dedication of property in Texas for low to middle income housing
is accomplished through a Land Use Restriction Agreement ("LURA")
with the Texas Department of Housing and Community Affairs
("TDHCA").

     The Debtor in the instant case built and managed an
apartment complex subject to a LURA in Sweeny, Texas, consisting
of 76 three- and four-bedroom units in 19 single story buildings,
in a garden style, with paths and shrubbery.

     Beginning in approximately 2010, Oak Grove Commercial
Mortgage ("Oak Grove"), a private, for-profit, business servicing
Debtor's debt on behalf of Fannie Mae pursuant to a contract that
is not before the court, made ever-increasing demands for repairs
on the property.

     On the surface, the dispute between Debtor on one side,
and Fannie Mae and Oak Grove on the other side, appeared to
involve two basic issues:  The scope of repairs necessary for the
property, and whether funds to make those repairs were to be held
and disbursed by Oak Grove or by Debtor or Debtor's principals.

However, although the Debtor was never in default on payments of principal and interest under the loan, Oak Grove and Fannie Mae worked together in bad faith to drive toward a foreclosure of Debtor's interest in the property.  This drive was not motivated solely by a desire to ensure that the property was well-maintained.  Rather, Fannie Mae and Oak Grove perceived an opportunity to remove the property from the restrictions of the LURA, and to trigger recourse liability for the Debtor's principals, by foreclosing.  This would increase the value of the property by enabling the new owner of the property to charge market rents.  Oak Grove previously has foreclosed on Fannie Mae properties in Kentucky and Oklahoma, both of which were current on principal and interest, but as to which some problem other than staying current on principal and interest was perceived by Oak Grove to justify foreclosure.  Individuals working for Fannie Mae and Oak Grove frequently testified at this trial as to their seeking to serve low income tenants.  However, their actions drove toward foreclosure, on a note that was current on principal and interest, and foreclosure would have abolished the LURA which assured availability of apartments to low income tenants.

Fannie Mae posted the property for a foreclosure sale to take place on September 1, 2015.  The posting for foreclosure led to Debtor's filing of the petition in the instant Chapter 11 case.  Fannie Mae expected to recover its costs from Debtor under

3

the loan documents.

After the filing of the bankruptcy case, Fannie Mae and Oak Grove focused on litigation rather than negotiation, resulting in costs to Debtor, as well as to Oak Grove and Fannie Mae, that were out of proportion to the amount in controversy.

The court has considered the pleadings; the docket sheets in the instant adversary proceeding and Chapter 11 case, of which the court takes judicial notice; the testimony of the witnesses, developed over 25 days of trial; the documentary evidence; and the memoranda of law submitted by the parties.  The following are the Findings of Fact and Conclusions of Law of the court.  A separate conforming Judgment will be entered.  To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such.  To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Table of Contents</u>

1.   Findings of Fact
     A.   Formation of Debtor
     B.   LURA
     C.   Loan Documents
          1.   Note
          2.   Deed of Trust
          3.   Replacement Reserve and Security Agreement
          4.   Assignment
     D.   Servicing Relationship
     E.   Prepetition Course of Dealing Among the Parties
          1.   Prior to Pre-Negotiation Letter
          2.   First Pre-Negotiation Letter
          3.   The Push Toward Foreclosure
     F.   Overview of the Chapter 11 Case

G.   Fannie Mae's Motion For Relief From Stay
H.   Plan and DIP Financing Negotiations
I.   The Confirmed Plan
J.   Post-Confirmation Operations
K.   The Pleadings in the Instant Adversary Proceeding
     1.   Debtor's Complaint
     2.   Defendants' Answer and Fannie Mae's Counterclaim
     3.   Windmill's Answer to Fannie Mae's Counterclaims
L.   Postpetition Matters
     1.   The 506(b) Motion
     2.   Debtor's Objection to the 506(b) Motion
M.   Testimony as to the 506(b) Motion
     1.   Keith Aurzada, of Bryan Cave
     2.   Brian Kilmer, of KCW
N.   Credibility of Witnesses
2.   Conclusions of Law
A.   Jurisdiction and Authority to Enter Final Orders
B.   Preference
C.   Standing
D.   Breach of Contract
     1.   Valid Contract
     2.   Performance or Tendered Performance
     3.   Breach
     4.   Damages
          a.   To the Extent of Defendants' Breach
          b.   To the Extent of Debtor's Breach
E.   Declaratory Judgment
F.   Claim Objection
G.   The 506(b) Motion

     1.   Attorney Fees
          a.   The Motion for Relief from Stay
          b.   DIP Financing, Plan, and Disclosure Statement
     2.   Expert Witness Fees
     3.   "Miscellaneous Fees"
     4.   Postpetition Interest
     5.   Summary of 506(b) Claim

## Findings of Fact

Windmill Run Associates, Ltd. ("Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 29, 2015.  Debtor owns and operates the 76-unit Windmill Run apartment complex as a Low Income Housing Tax Credit

("LIHTC") property, in Sweeny, Texas.  Debtor's Chapter 11 plan
was confirmed, by order entered on August 15, 2016.  (Docket No.
267, Case No. 15-80319-G3-11).

    A.   Formation of Debtor

        Debtor was formed through a series of agreements
between Frank Fonseca, Mark Walther, National Partnership
Investments Corp. ("NAPICO"), and various of their affiliates.
Prior to the formation of Debtor, Fonseca had previously worked
at NAPICO, which was a syndicator of LIHTC properties.  (Tr.
11/18/2016, at p. 11).[1]  Fonseca headed NAPICO's asset management
department, overseeing NAPICO's portfolio of approximately 10,000
LIHTC apartment units.  (Tr. 11/18/2016, at p. 11-12).  After
Fonseca left NAPICO, he and Walther formed American Communities,
an entity which develops apartment complexes, primarily LIHTC
properties.  (Tr. 11/18/2016, at p. 18).  Fonseca testified that
American Communities has developed approximately 1,000 apartment
units.  (Tr. 11/18/2016, at p. 19).  He testified that the

_____

   [1]Mark Breen, who worked with Fonseca at NAPICO, and has been
at various times through his entities an equity holder,
guarantor, developer, and active in management of the Debtor,
testified that syndicators of LIHTC properties raise money from
investors, in exchange for providing those investors with the tax
credits, the losses generated through depreciation, and a portion
of the cash flow from the project.  (Tr. 12/12/2016, at p. 38).
He testified that syndicators get notice under loan documents
associated with LIHTC properties because they have a fiduciary
duty to their investors to make sure they receive the tax
credits, and because they must set aside a reserve account to
handle material and non-material events that could affect the
property, such as tax recapture.  (Tr. 12/12/2016, at p. 36-37).

Windmill Run apartment complex was American Communities' first development.  (Tr. 11/18/2016, at p. 18).

In the agreements forming Debtor, Windmill Run Development, Inc., an entity owned by Fonseca and Walther, became the operating general partner of the Debtor entity.  National Corporate Tax Credit Inc. X ("NCTC X") became the administrative general partner of the Debtor entity.[2]  National Corporate Tax Credit Fund X ("NCTC Fund X") became the limited partner of the Debtor entity.  (Windmill Exhibit 38).[3]  NCTC Fund X was an entity administered by NCTC X, and syndicated to investors by NAPICO.  (Tr. 11/18/2016, at p. 20).  NCTC X was a NAPICO entity. (Tr. 11/18/2016, at p. 20).  Fonseca testified that the tax benefits generated by the property were to flow to the investors in NCTC Fund X.  (Tr. 11/18/2016, at p. 20).  Fonseca testified that NAPICO holds a nominal ownership interest in the Debtor. (Tr. 11/21/2016, at p. 124).

Breen testified that he was the construction company, part of the development company, and gave guaranties to the tax credit investors with respect to the completion and initial

---

[2]In a 2002 amendment to the partnership agreement, NCTC X withdrew as administrative general partner, and was readmitted as administrative limited partner.  (Windmill Exhibit 39).

[3]The exhibits marked such as "Windmill Exhibit 1" are those which appeared in the exhibit book prepared by Debtor in Adversary No. 15-8013.  Debtor's exhibits with respect to the 506(b) motion are marked such as "Windmill Exhibit 1 - 506(b)."

leasing of the property.[4]  (Tr. 12/12/2016, at p. 32).

During December, 2000, Debtor and the Texas Department of Housing and Community Affairs ("TDHCA") executed a "Declaration of Land Use Restrictive Covenants for Low-Income Housing Credits" ("LURA").  The parties have stipulated that the LURA was filed in the real property records of Brazoria County, Texas on December 29, 2000.  (Docket No. 80, Adv. No. 15-8013, at Exhibit 1, Fact No. 2).

On December 18, 2002, Debtor closed on permanent financing of the apartment complex.  Debtor executed a note payable to Midland Mortgage Investment Corp. ("Midland Mortgage"), in the original principal amount of $2,024,000. (Windmill Exhibit 15).

Effective as of January 1, 2012, Debtor amended its partnership agreement, with Windmill Venture, LLC taking over as the administrative partner of Debtor, in place of NCTC X and NCTC Fund X.[5]  (Windmill Exhibit 40). Fonseca testified that Windmill

---

[4]The court infers from Breen's use of the word "company," that Breen's entities, rather than Breen individually, performed some of these functions.  Breen testified that, after the closing of the permanent financing, Breen was not actively involved in Debtor's management until 2015.  (Tr. 12/12/2016, at p. 48).  As further addressed below, an entity in which Breen holds an ownership interest purchased the limited partnership interest of NCTC X and NCTC Fund X in 2012.

[5]The original document (Windmill Exhibit 40) identified Windmill Venture, LLC as the "administrative general partner."  A subsequent correction document (Windmill Exhibit 41), executed in February, 2016, identifies Windmill Venture, LLC as the

Venture, LLC is owned by Breen, Fonseca, and Walther.  (Tr. 11/18/2016, at p. 19).  Breen testified that he repurchased an interest in the Debtor, through the 2012 transaction, because the compliance period under the LURA was nearing completion.  (Tr. 12/12/2016, at p. 47).  Breen testified that he acquires properties that are near the end of the compliance period, rehabilitates the properties, and puts them back into service as LIHTC properties with new syndicated tax credits.  (Tr. 12/12/2016, at p. 44).

    B.   <u>LURA</u>

Section 4 of the LURA provides that the project owner covenants that at least 40 percent of the units will continuously be maintained as both rent-restricted and occupied by individuals whose income is 60 percent or less of the area median gross income.  (Windmill Exhibit 3).

Section 5(a) of the LURA terminates the LURA after a 15 year compliance period and an additional 15 year extended use period.  (Windmill Exhibit 3).

Section 5(b)(1) of the LURA provides that the LURA terminates with respect to each building on the date the building

---

"administrative limited partner."  Fonseca testified that the identification of Windmill Venture, LLC in the 2012 amendment at Windmill Exhibit 40 was an error, containing language from a prior template.  He testified that the error was discovered after Fannie Mae filed suit against Fonseca.  (Tr. 11/21/2016, at p. 73-75).

is acquired by foreclosure, or instrument in lieu of foreclosure, unless the Secretary of the Treasury of the United States determines that the acquisition is part of an arrangement with the taxpayer the purpose of which is to terminate the LURA. (Windmill Exhibit 3).

Breen signed the LURA on behalf of Debtor, as its vice president, on December 22, 2000. (Windmill Exhibit 3).

Fonseca testified that tax credit recapture occurs where there is a failure to comply with the LURA. If there is a failure to comply during a compliance period, investors generally must repay the tax benefits they have obtained. (Tr. 11/18/2016, at p. 16). Fonseca testified that neither he, nor Breen or Walther, have obtained any of the tax benefits from operation of the property. (Tr. 11/18/2016, at p. 17).

Fonseca testified that, while he was at NAPICO, NAPICO would monitor its tax recapture exposure, even after its investors were "out of the deal." (Tr. 11/21/2016, at p. 4). He testified that a potential tax recapture liability during 2015 to the entities which received a tax benefit with respect to the Windmill Run property would have required the entities which received a tax benefit to write a check to the Internal Revenue Service in an amount of approximately $300,000. (Tr. 11/21/2016, at p. 126-127).

10

C.    Loan Documents

The loan documents for the December 18, 2002

transaction included, inter alia, a note (Windmill Exhibit 15), a

deed of trust (Defendants Exhibit 2), and a "Replacement Reserve

and Security Agreement" ("RRSA") (Defendants Exhibit 3).[6].

1.    Note

The note provides in pertinent part in the preamble for

an initial principal amount of $2,024,000, and an interest rate

of 6.58 percent.  Paragraph 1 defines "Lender" to mean the holder

of the note.  Paragraph 3(b) requires the borrower to pay monthly

installment payments of $12,899.73, and sets a maturity date of

January 1, 2021.  Paragraph 9 provides that it is nonrecourse as

to the borrower unless the occurrence of, inter alia at Paragraph

9(c), "a Transfer that is an Event of Default under Section 21 of

the Security Instrument."  Paragraph 10(a)(2) requires the

borrower to pay, upon the Lender's exercise of any right of

acceleration under the note, "the prepayment premium calculated

pursuant to Schedule A."  Paragraph 11 requires the borrower to

pay:

> [A]ll expenses and costs, including fees and out-of-
> pocket expenses of attorneys and expert witnesses and
> costs of investigation, incurred by Lender as a result

---

[6]An additional document, a "Completion/Repair Security
Agreement," was addressed in the testimony.  (See Tr. 11/1/2016,
at p. 114, 117; Tr. 11/3/2016, at p. 5-6).  It is not in
evidence, and does not appear to be central to the dispute before
the court.

of any default under this Note or in connection with
efforts to collect any amount due under this Note, or
to enforce the provisions of any of the other Loan
Documents, including those incurred in post-judgment
collection efforts and in any bankruptcy proceeding
(including any action for relief from the automatic
stay of any bankruptcy proceeding) or judicial or non-
judicial foreclosure proceeding.

(Windmill Exhibit 15).

Paragraph 13 of the note provides, <u>inter</u> <u>alia</u>, that the

borrower and the key principals waive notice of demand and of

notice of acceleration.   (Windmill Exhibit 15).

An "Acknowledgment and Agreement of Key Principal to

Personal Liability for Exceptions to Non-recourse Liability"

attached to the note obligates persons identified as "Key

Principals" to pay any amount for which the borrower is

personally liable under Paragraph 9 of the note.   Fonseca and

Walther signed as Key Principals.   Schedule A identifies a

formula for calculation of a prepayment premium.   (Windmill

Exhibit 15).

2.   <u>Deed of Trust</u>

The deed of trust, in the preamble, conveys the

property as security for the borrower's obligations to repay the

debt, and to perform all the covenants and agreements of the

borrower under the loan documents.   Section 1(p) defines "Lender"

as the entity identified as the Lender in the first paragraph of

the deed of trust (which is identified as Midland Mortgage

Investment Corporation), and its successors and assigns, or any

12

subsequent holder of the note.  Section 1(r) defines "Loan

Servicer" as:

> [T]he entity that from time to time is designated by
> Lender to collect payments and deposits and receive
> notices under the Note, this Instrument and any other
> Loan Document, and otherwise to service the loan
> evidenced by the Note for the benefit of Lender.
> Unless Borrower receives notice to the contrary, the
> Loan Servicer is the entity identified as "Lender" in
> the first paragraph of this Instrument.

(Defendants Exhibit 2).

Section 1(s)(12) of the deed of trust defines

"Mortgaged Property" to include, <u>inter alia</u>, "all Imposition

Deposits."  Imposition Deposits are defined in Section 7(a) of

the deed of trust, which provides:

> 7. DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.
>
> (a) Borrower shall deposit with Lender on the day
> monthly installments of principal or interest, or both,
> are due under the Note (or on another day designated in
> writing by Lender), until the Indebtedness is paid in
> full, an additional amount sufficient to accumulate
> with Lender the entire sum required to pay, when due
> (1) any water and sewer charges which, if not paid, may
> result in a lien on all or any part of the Mortgaged
> Property, (2) the premiums for fire and other hazard
> insurance, rent loss insurance and such other insurance
> as Lender may require under Section 19, (3) Taxes, and
> (4) amounts for other charges and expenses which Lender
> at any time reasonably deems necessary to protect the
> Mortgaged Property, to prevent the imposition of liens
> on the Mortgaged Property, or otherwise to protect
> Lender's interests, all as reasonably estimated from
> time to time by Lender.  The amounts deposited under
> the preceding sentence are collectively referred to in
> this Instrument as the "Imposition Deposits".
>
> The obligations of Borrower for which the Imposition
> Deposits are required are collectively referred to in
> this Instrument as "Impositions".  The amount of the

13

Imposition Deposits shall be sufficient to enable
Lender to pay each Imposition before the last date upon
which such payment may be made without any penalty or
interest charge being added.  Lender shall maintain
records indicating how much of the monthly Imposition
Deposits and how much of the aggregate Imposition
Deposits held by Lender are held for the purpose of
paying Taxes, insurance premiums and each other
obligation of Borrower for which Imposition Deposits
are required.  Any waiver by Lender of the requirement
that Borrower remit Imposition Deposits to Lender may
be revoked by Lender, in Lender's discretion, at any
time upon notice to Borrower.

(Defendants Exhibit 2).

Section 7(e) of the deed of trust provides:

If an Event of Default has occurred and is continuing,
Lender may apply any Imposition Deposits, in any
amounts and in any order as Lender determines, in
Lender's discretion, to pay any Impositions or as a
credit against the Indebtedness.  Upon payment in full
of the Indebtedness, Lender shall refund to Borrower
any Imposition Deposits held by Lender.

(Defendants Exhibit 2).

Section 8 of the deed of trust provides:  "Borrower

shall deposit with Lender such amounts as may be required by any

Collateral Agreement and shall perform all other obligations of

Borrower under each Collateral Agreement."  (Defendants Exhibit

2).

Section 17(a) of the deed of trust provides:

17. PRESERVATION, MANAGEMENT AND MAINTENANCE OF
MORTGAGED PROPERTY.

(a) Borrower (1) shall not commit waste or permit
impairment or deterioration of the Mortgaged Property,
(2) shall not abandon the Mortgaged Property, (3) shall
restore or repair promptly, in a good and workmanlike
manner, any damaged part of the Mortgaged Property to

14

the equivalent of its original condition, or such other
condition as Lender may approve in writing, whether or
not insurance proceeds or condemnation awards are
available to cover any costs of such restoration or
repair, (4) shall keep the Mortgaged Property in good
repair, including the replacement of Personalty and
Fixtures with items of equal or better function and
quality, (5) shall provide for professional management
of the Mortgaged Property by a residential rental
property manager satisfactory to Lender under a
contract approved by Lender in writing, and (6) shall
give notice to Lender of and, unless otherwise directed
in writing by Lender, shall appear in and defend any
action or proceeding purporting to affect the Mortgaged
Property, Lender's security or Lender's rights under
this Instrument.  Borrower shall not (and shall not
permit any tenant or other person to) remove, demolish
or alter the Mortgaged Property or any part of the
Mortgaged Property except in connection with the
replacement of tangible Personalty.

(Defendants Exhibit 2).

Section 21 of the deed of trust identified, _inter alia_,
as events of default:  a transfer of a controlling interest in
the borrower; or a transfer of all or any part of the key
principals' interest in the borrower (other than a limited
partnership interest).  (Defendants Exhibit 2).

Section 22 of the deed of trust identified, _inter alia_,
as events of default:

(a) any failure by Borrower to pay or deposit when due
any amount required by the Note, this Instrument or any
other Loan Document;

* * *

(e) any Event of Default under Section 21;

* * *

15

(g) any failure by Borrower to perform any of its
obligations under this Instrument (other than those
specified in Sections 22(a) through (f)), as and when
required, which continues for a period of 30 days after
notice of such failure by Lender to Borrower, but no
such notice or grace period shall apply in the case of
any such failure which could, in Lender's judgment,
absent immediate exercise by Lender of a right or
remedy under this Instrument, result in harm to Lender,
impairment of the Note or this Instrument or any other
security given under any other Loan Document;

(h) any failure by Borrower to perform any of its
obligations as and when required under any Loan
Document other than this Instrument which continues
beyond the applicable cure period, if any, specified in
that Loan Document.

(Defendants Exhibit 2).

Section 24(b) of the deed of trust provides that the

forbearance by the lender of exercising any of its remedies under

the loan documents shall not be a waiver of or preclude the

exercise of any other right or remedy.  (Defendants Exhibit 2).

Section 32 of the deed of trust provides that the note

may be sold, and that the Loan Servicer may be changed, with or

without sale of the note.  (Defendants Exhibit 2).

Section 39 of the deed of trust provides:

39. LOAN SERVICING. All actions regarding the serv1cmg
of the loan evidenced by the Note, including the
collection of payments, the giving and receipt of
notice, inspections of the Property, inspections of
books and records, and the granting of consents and
approvals, may be taken by the Loan Servicer unless
Borrower receives notice to the contrary.  If Borrower
receives conflicting notices regarding the identity of
the Loan Servicer or any other subject, any such notice
from Lender shall govern.

(Defendants Exhibit 2).

16

Section 43 of the deed of trust provides, <u>inter</u> <u>alia</u>, that at any time during the existence of an event of default, the Lender may accelerate the note, declaring the debt immediately due and payable.  (Defendants Exhibit 2).

The deed of trust contains an "Exhibit B," which modifies the note and the deed of trust.  Paragraph 1 of Exhibit B adds the following language as Paragraph 31(d) of the note:

> (d) Lender agrees that effective notice to Borrower under this Instrument and the Loan Documents shall require delivery of a copy of such notice to the Equity Investor.  Such notice shall be given in the manner provided in this Section, at the Equity Investor's address set forth below:
>
> > NAPICO
> > 9090 Wilshire Boulevard
> > Suite 201
> > Beverly Hills, California 90211
> > Attention: Peter Stoughton

(Defendants Exhibit 2).

Paragraph 2 of Exhibit B to the deed of trust adds, <u>inter</u> <u>alia</u>, the following Paragraph 54 to the deed of trust:

> 54. RECOURSE LIABILITY. The provisions of Paragraph 9(c) of the Note, as they relate to Events of Default described in Paragraphs 9(c)(1) and 9(c)(2), shall be operative only after the Equity Investor has been given 30 days notice of the applicable Event(s) of Default described in Paragraphs 9(c)(1) and 9(c)(2), together with an opportunity within such 30-day period to remedy the applicable Event(s) of Default.  In all events, Lender shall be entitled during such 30-day period to exercise all of its rights and remedies under this Instrument upon the occurrence of such Event of Default other than foreclosure of the Mortgaged Property.

(Defendants Exhibit 2).

3.   <u>Replacement Reserve and Security Agreement</u>

Paragraph 1 of the RRSA requires that the borrower

deposit $1,482 per month with the lender designated as a

"Replacement Reserve."  (Defendants Exhibit 3).

Paragraph 2 of the RRSA provides:

2. Loans with Terms Over 10 Years.  If the Loan term
exceeds 10 years, then, no earlier than the 6th month
and no later than the 9th month of the year which
commences on the 10th anniversary of the date of this
Agreement (and the 20th anniversary of the date of this
Agreement if the Loan term exceeds 20 years), a
physical needs assessment shall be performed on the
Property by Lender at the expense of Borrower, which
expense may be paid of [sic] out of the Replacement
Reserve. If determined necessary by Lender, after
review of the physical needs assessment, Borrower's
required Monthly Deposits to the Replacement Reserve
set forth shall be adjusted for the remaining Loan term
so that the Monthly Deposits will create a Replacement
Reserve that will in Lender's determination, be
sufficient to meet required Replacements (defined
below).

(Defendants Exhibit 3).

Paragraph 3(a) of the RRSA provides that the borrower

assigns the Replacement Reserve to the lender as additional

security for the borrower's obligations under the loan documents.

Paragraph 3(b) of the RRSA provides for the lender to make

disbursements from the Replacement Reserve to reimburse the

borrower for the costs of those items listed on Exhibit A to the

RRSA, defined as "Replacements."  Exhibit A of the RRSA

identifies the items covered as dishwashers, countertops,

carpeting, roadways, pool/spa equipment, pool/spa plaster, common

area carpet, and exterior walls, wood/stucco.  (Defendants
Exhibit 3).

Paragraph 4 of the RRSA provides for disbursements from
the Replacement Reserve upon written request from the borrower,
after completion of the replacement for which reimbursement is
sought.  (Defendants Exhibit 3).

Paragraph 5.1 of the RRSA provides in pertinent part:

5.1 Workmanlike Completion

(a) Borrower shall make each Replacement when required
in order to keep the Property in good order and repair
and in a good marketable condition and to keep the
Property or any portion thereof from deteriorating.
Borrower shall complete all Replacements in a good and
workmanlike manner as soon as practicable following the
commencement of making each such Replacement.

(b) Lender shall have the right to approve all
contracts or work orders with materialmen, mechanics,
suppliers, subcontractors, contractors or other parties
providing labor or materials in connection with the
Replacements.  Upon Lender·s request, Borrower shall
assign any contract or subcontract to Lender.

* * *

(d) If at any time during the term of the Loan, Lender
determines that replacements not listed on Exhibit A
are advisable to keep the Property in good order and
repair and in a good marketable condition, or to
prevent deterioration of the Property (the "Additional
Replacements") Lender may send Borrower written notice
of the need for making such Additional Replacements.
Borrower shall promptly commence making such Additional
Replacements in accordance with all the requirements of
the Security Instrument.  Reimbursement from the
Replacement Reserve for such Additional Replacements
shall not be made unless Lender has determined to do so
pursuant to Section 4(f). Except for Section 4, all
references in this Agreement to "Replacements" shall
include the "Additional Replacements."

19

(Defendants Exhibit 3).

Paragraph 6.1 of the RRSA provides that a default under the RRSA which is not cured within 10 days after notice from the lender is a default under the "Security Instrument," which is defined in Paragraph B of the preamble to be the deed of trust. Paragraph 6.2 provides that upon default, the lender may use the Replacement Reserve for any purpose, including repayment of the debt, the prepayment premium, or reimbursement of losses and expenses, including reasonable attorney fees. (Defendants Exhibit 3).

Paragraph 10 of the RRSA provides that if the balance of the Replacement Reserve is less than the current estimated cost to make the replacements required by the lender, the borrower shall deposit the shortage within 10 days of request by the lender. (Defendants Exhibit 3).

4.   Assignment

On December 18, 2002, Midland Mortgage Investment Corporation executed an assignment to Fannie Mae[7] of all of its beneficial interest under the note, deed of trust and other loan documents. The assignment was filed in the real property records

---

[7]Noakes testified that Fannie Mae is a name used by the Federal National Mortgage Association. He testified that Fannie Mae has not filed an assumed name certificate in Texas or in Brazoria County, Texas. (Tr. 11/1/2016, at p. 41-42). The assignment identified the transferee as "Fannie Mae," not as FNMA.

of Brazoria County, Texas on December 19, 2002.  (Defendants
Exhibit 4).

    D.   Servicing Relationship

       The loan servicing agreement between Fannie Mae and Oak
Grove is not in evidence.  Fannie Mae withheld its production to
Debtor during discovery, and vehemently objected to its
production, in pretrial hearings and at trial, on grounds it
contains confidential information, such as pricing agreements as
between Fannie Mae and Oak Grove.  (See, e.g., Tr. 11/8/2016, at
p. 20).

       Jim Noakes, a senior asset manager for Fannie Mae,
testified that Defendant Oak Grove Commercial Mortgage ("Oak
Grove") became the servicer for Fannie Mae of its loan to Debtor.
(Tr. 11/1/2016, at p. 32).  Noakes testified that Oak Grove
services the loan under contract with Fannie Mae.  (Tr.
11/1/2016, at p. 64).  Noakes testified that he does not know
whether Oak Grove acts on Fannie Mae's behalf when it acts as
servicer.  (Tr. 11/1/2016, at p. 64).  Noakes admitted that a
statement by Oak Grove, in correspondence from Oak Grove to
Debtor, that Oak Grove represents Fannie Mae in connection with
the loan, is a truthful statement.  (Tr. 11/1/2016, at p. 68).

       Noakes testified that Oak Grove is in charge of
billing, invoicing, collecting payments, and dealing with the
borrowers; collecting escrows; and monitoring, maintaining and

disbursing funds from escrow.   (Tr. 11/8/2016, at p. 19).

Bill Johnson testified that he is a vice president and special asset manager with Oak Grove, which is now known as Jones Lang LaSalle ("JLL").   (Tr. 11/28/2016, at p. 52).   Johnson testified that he previously was employed by MMA (which had acquired Midland Mortgage, the originator of Debtor's loan)[8] from 2005 through 2008.   (Tr. 12/1/2016, at p. 98).   Johnson testified that, prior to working with MMA, he worked for a tax credit developer beginning in 1988.   (Tr. 12/1/2016, at p. 98).

Johnson testified that he was first assigned a role as to the Windmill Run property in 2005.   (Tr. 12/1/2016, at p. 105).   Johnson testified that he began working at Oak Grove in July, 2010.[9]   (Tr. 11/28/2016, at p. 53).   Oak Grove acquired substantially all of the assets of MMA on February 3, 2009. (Windmill Exhibit 28).   Johnson testified that JLL acquired Oak Grove in October or November, 2015.   (Tr. 12/1/2016, at p. 100).

Johnson testified that JLL has a dual role and responsibility as both lender and servicer, because it originated the loan.   (Tr. 12/1/2016, at p. 114).   Johnson testified that Oak Grove obtained servicing rights from Midland Mortgage with

---

[8]Johnson testified that MMA acquired Midland Mortgage.   (Tr. 11/28/2016, at p. 54).

[9]In the time period between 2008 and 2010, Johnson was unaffiliated with any of the entities involved in the instant dispute.   (Tr. 12/1/2016, at p. 98-99).

respect to the loan.  (Tr. 11/28/2016, at p. 103).[10]  The court
finds this testimony not credible, because Midland Mortgage had
previously executed an assignment of all of its interest in the
loan to Fannie Mae.  See Section C. 4., above.  The court finds
that Oak Grove pursued whatever actions it took with respect to
Debtor, on behalf of Fannie Mae, under its servicing agreement
(which is not in evidence), and not under any independent right
to do so pursuant to its acquisition of Midland Mortgage.

Fannie Mae added further confusion to the roles, as
between Fannie Mae and Oak Grove, with respect to Debtor's loan.
Notwithstanding that the loan documents identify the holder of
the note, Fannie Mae, as the lender, Noakes testified that Oak
Grove is the lender, and that Fannie Mae is the "noteholder."
(Tr. 11/1/2016, at p. 34).

The court finds that, at all times pertinent to the
disputes in the instant adversary proceeding and 506(b) motion,
Fannie Mae has been the lender identified in the loan documents,
and Oak Grove has been Fannie Mae's servicer and agent.

    E.    Prepetition Course of Dealing Among the Parties

        1.    Prior to Pre-Negotiation Letter

Fonseca testified that Debtor employed Capstone
Property Management ("Capstone") as the property management

_____

[10]Johnson testified that Oak Grove services multiple loans
for Fannie Mae.  (Tr. 11/28/2016, at p. 103).

company of the apartment complex for several years prior to the date of filing of the bankruptcy petition, including in 2010. (Tr. 11/18/2016, at p. 58).

Johnson testified that he conducted annual inspections of the property for Oak Grove. (Tr. 11/28/2015, at p. 145). He testified that he made his first visit to the property when he was employed by MMA in 2006. He testified that the property was in reasonably good condition in 2006. (Tr. 12/1/2016, at p. 110).

Johnson testified that, during 2010, there was a problem with a lift pump station. (Tr. 11/29/2016, at p. 111). Johnson testified that a lift pump station pumps sewage from a lower to a higher elevation, and reduces solid waste to a liquid form before it enters the city's sewer system. (Tr. 11/29/2016, at p. 19).

Diana Romero, a district manager with Capstone, requested an advance from the Replacement Reserve to replace the lift pump station. The request was transmitted to Amie Hadder at Oak Grove. Hadder forwarded the request to Renee Trinkaus, also at Oak Grove. Email correspondence between Hadder and Trinkaus dated December 2, 2010 indicates that the amount requested was $3,983.43, and that the balance in the Replacement Reserve was $56,249.87. (Windmill Exhibit 29). Johnson testified that he does not know whether Oak Grove issued any payments based on the 2010 request. (Tr. 11/29/2016, at p. 111).

24

In 2012, more serious questions arose regarding the operation and financial condition of the property.  In an email dated April 25, 2012, from Michael Cerio, an asset manager at Oak Grove, to Brenda Crawford, at Capstone, Oak Grove requested an update as to issues regarding parking lot resealing and striping, trim painting, roof stains, tree trimming, and cracked asphalt sidewalks.  In the email, Cerio recites that he is "following up on the last inspection that was done at Windmill Run."  (Defendants Exhibit 17).  Johnson, in his testimony, did not state that he was the one who had inspected the property in 2012.  Instead, he cited to Cerio's letter.  (Tr. 12/1/2016, at p. 121).

On May 23, 2012, Cerio notified Romero and Crawford that an order would be placed for a Physical Needs Assessment ("PNA") pursuant to the RRSA.  (Windmill Exhibit 32).

The front page of what purports to be the 2012 PNA prepared by f3, Inc. ("f3"), bears a "report date" of June 15, 2012, and identifies the f3 project number as 12.0246.  On page three, f3 states that it conducted a survey of the property on June 11, 2012.  On page four, f3 identifies repair items with cost estimates totaling $94,170.  None of the items in the 2012 PNA were identified as "life safety issues."  Beginning on page six, there is a table purporting to identify the items which comprise the $94,170.  The items identified are removing dead trees, making several asphalt and pothole repairs, sealing and

25

restriping the parking lot, and replacing the asphalt sidewalks
with concrete.  The largest line items are the sidewalk
replacement ($60,000) and the tree removal ($17,000).  In
contradiction of the front page, the table identifies the f3
project number as 12.0124.  It also identifies the property as
"The Springs;" states that the date of assessment is April 4,
2012; and that the date of the report is April 24, 2012.
(Defendants Exhibit 18).  The court notes that April 24, 2012 is
one day before the April 25, 2012 email from Cerio to Crawford
requesting an update as to the status of repairs, and one month
before Oak Grove notified Debtor that a PNA was to occur.  The
court also notes that Windmill Run was never known as "The
Springs."  The court finds that the 2012 PNA contains important
inconsistencies, and is unreliable and not probative.

On October 18, 2012, Melissa Casale of Oak Grove
notified Romero that, according to the 2012 PNA, Oak Grove had
determined that the monthly replacement reserve deposit was
sufficient to cover estimated future capital needs.  (Defendants
Exhibit 19).

During May, 2012, Debtor made a request for
disbursement from the Replacement Reserve, in the amount of
$23,031.17.  The request covered replacement of appliances,
removal of dead trees, and HVAC items.  Johnson had apparently
failed to notice the inadequacies of the 2012 PNA.

Notwithstanding the October 18, 2012 letter stating that the
replacement reserve was sufficient, Oak Grove does not appear to
have responded to the May, 2012 request for disbursement prior to
February, 2013.  By email dated February 26, 2013, Johnson
notified Crawford and Jennifer Walker of Capstone that "there
will be no disbursements from the replacement reserve account
until we can satisfactorily resolve the outstanding deferred
maintenance issues identified in the Physical Needs Assessment
previously provided to Brenda Crawford."  (Windmill Exhibit 30).

        A February 20, 2013 email from Johnson to Crawford and
Walker suggests that Johnson conducted his own inspection of the
property on that date.  In addition to the items identified in
the 2012 PNA, Johnson identified issues with missing door
hardware, appliances, water heaters, and air conditioning
compressors, as well as issues with a gutter, the lift pump
station, and the swimming pool.  Johnson estimated the cost of
immediate repairs to be $150,000.  His email demands from
Capstone by March 1, 2013 a response "regarding the cost to
repair, when work can begin, source of funding and the
anticipated completion date with all units back online."
(Windmill Exhibit 30).

        Hayes testified that, beginning in 2013, Johnson's
primary concern appeared to be that the property had asphalt
paving rather than concrete for sidewalks, driveways, and parking

27

areas.  (Tr. 12/8/2016, at p. 99-101).

On October 16, 2013, TDHCA notified Debtor that it
would conduct an inspection of the property on October 29, 2013.
(Defendants Exhibit 20).  Brenna Hayes, who has been the onsite
property manager since 2010, testified that TDHCA conducts its
inspections every three years.  (Tr. 12/8/2016, at p. 112).

Hayes testified that Capstone wasted money and did not
make funds available for needed items.  She testified that
Capstone charged Debtor for uniforms for herself and the
maintenance staff that were not received.  She testified that
Capstone sent numerous items to Debtor by express delivery,
including monthly reports prepared by Hayes, and check stubs,
despite the fact that the checks had been deposited directly into
the workers' accounts.  She testified that Capstone was paid for
accounting services, but then hired an outside entity, at
additional expense, to pay Debtor's bills.  (Tr. 12/8/2016, at p.
120).

After the October 29, 2013 inspection, TDHCA notified
Debtor of several deficiencies, and, by letter dated November 20,
2013, requested that certain work be completed.  (Defendants
Exhibit 21).[11]

---

[11]Johnson testified that he is aware some of the issues
raised by TDHCA have been addressed.  (Tr. 12/7/2016, at p. 64).
Michael Biederstadt testified that the remaining issues related
to the slope and condition of the walkways.  (Tr. 12/8/2016, at
p. 23-24).  Hayes testified that all of the outstanding issues

Prior to 2014, nearly all of the communications in evidence occurred between Johnson, as the asset manager for Oak Grove, and either Capstone personnel or Walther.  Johnson testified that he had communicated with Walther by phone several times during 2013, regarding damage to the property and improving property operations.  (Tr. 12/1/2016, at p. 148-149).  Johnson testified that Walther assured him that Debtor "was looking for a resolution to the damage at the property, but that their cash situation...made it difficult for them to commit to a sizeable amount of cash to the property."  (Tr. 12/1/2016, at p. 150).

Fonseca testified that, from inception of the loan, the property was not generating the cash flow that was projected pro forma.  He testified that the partners made multiple advances to ensure that Debtor was able to meet its obligations, including debt service.  (Tr. 11/18/2016, at p. 58).  He testified credibly that Oak Grove denied multiple requests to make disbursements from the Replacement Reserve in order to address the property condition.  (Tr. 11/18/2016, at p. 59-60).  Fonseca testified that Breen, through his entity National Mortgage Investors, and Fonseca and Walther, through their entity American Communities, advanced approximately $1.2 million to Debtor prepetition.  (Tr.

---

have been addressed.  She testified that TDHCA conducted its next regularly scheduled inspection in 2016, and did not identify any remaining issues with respect to the property condition.  (Tr. 12/8/2016, at p. 113-114).

11/21/2016, at p. 92).[12]

Johnson testified that, in June, 2014, he received an email from Walther referring him to Fonseca for any further communications regarding the property. (Tr. 11/29/2016, at p. 83).

Fonseca testified that, during 2014, he became more involved in discussions with Fannie Mae and Oak Grove regarding the property. Fonseca testified that he brought Breen into the discussions. Fonseca testified that Johnson was involved in the discussions on behalf of Oak Grove, and Chris Beauregard was involved in the discussions on behalf of Fannie Mae. (Tr. 11/18/2016, at p. 75).[13] Breen testified that he asked John Cichon, Breen's construction manager,[14] to visit the property and give him an assessment of the conclusions Cichon reached. (Tr. 12/12/2016, at p. 149).

---

[12]Fonseca testified that these prepetition advances included, inter alia, $50,000 as a retainer for Debtor's counsel in the above captioned Chapter 11 case. (Tr. 11/18/2016, at p. 111).

[13]Noakes testified that Beauregard is a senior asset manager for Fannie Mae. (Tr. 11/1/2016, at p. 37). Noakes testified that Beauregard works in the Special Credits department. He testified that the Special Credits department assists the lender (the court infers that Noakes meant Oak Grove). (Tr. 11/3/2016, at p. 51).

[14]Fonseca testified that Cichon is Breen's construction manager. (Tr. 11/18/2016, at p. 79).

30

Fonseca testified that, in negotiating with Oak Grove and Fannie Mae beginning in 2014, he was told that a loan modification was a potential option, once the loan was removed from a pool of loans. (Tr. 11/18/2016, at p. 61).[15]

Johnson testified that, in telephone discussions during 2013 and 2014 with Walther, he stated that there were no loan modifications available. (Tr. 11/29/2016, at p. 80).

On November 26, 2014, the lift pump station at the property failed, resulting in the discharge of sewage onto the property. Capstone requested a disbursement from the Replacement Reserve, in order to replace two pumps at the lift pump station and clean up the sewage. On December 11, 2014, Johnson sent an email to Jennifer Norris of Capstone, stating that certain funds could be disbursed for the repair. In the December 11, 2014 email, Johnson also stated: "Please note, no other requests can be paid in 2014, and in 2015, ALL invoices submitted will need to be dated AFTER 1/1/15. The maximum amount that can be requested in 2015 will be $13,500, 2016 $19,000 and 2017 $26,000." On December 15, 2014, Johnson sent an email to Norris, allowing a disbursement of $9,890 to replace the two pumps, but not allowing reimbursement of the sewage cleanup costs. (Windmill Exhibit

_____

[15]Both Noakes and Johnson testified that the note was held at that time in a pool as part of an MBS (mortgage-backed security) trust. (Tr. 11/1/2016, at p. 32; Tr. 11/28/2016, at p. 138). Fannie Mae subsequently repurchased the note out of the MBS trust. (Tr. 11/1/2016, at p. 32).

31

35).

On November 26, 2014, the same date on which the lift pump station failed, Johnson emailed Fonseca regarding the asphalt at the apartment complex. Fonseca responded that the work was delayed "in order to try and generate some additional cash at the property." Johnson replied, stating a need "to have a discussion regarding the issues at the property and a firm timeline on addressing the outstanding issues." (Defendants Exhibit 37).

Breen testified that his understanding of Fonseca's response was that Debtor was raising additional cash from Breen, rather than from operations. (Tr. 12/12/2016, at p. 160).

Johnson testified that he had a telephone conversation with Breen after November 26, 2014, and before January 20, 2015, regarding a supplemental loan to finance the completion of repairs. (Tr. 12/5/2016, at p. 21).

On January 20, 2015, Johnson emailed Debtor's principals, stating that neither Fannie Mae nor Oak Grove would provide a supplemental loan. (Defendants Exhibit 37).

Breen testified that he had a telephone conversation with Johnson and Cichon on January 20, 2015. (Tr. 12/14/2016, at p. 30-31). He testified that he and Cichon discussed with Johnson a different basis for completion of the work. (Tr. 12/14/2016, at p. 33). Breen testified that Cichon reported to

32

him a number of bids obtained by Capstone, for a scope of work identified by Capstone in coordination with Johnson.  He testified that the aggregate amount of the bids was approximately $200,000.  (Tr. 12/12/2016, at p. 150-155).

On January 27, 2015, an email exchange took place between Fonseca and Johnson.  Fonseca stated that he had a call in to Breen to discuss Johnson's January 20, 2015 email.  Johnson replied to the email, stating that he had had the January 20, 2015 conversation with Breen and Chicon.  In his email, Johnson outlined what he believed were key points:

> 1) Neither Fannie Mae or Oak Grove Capital is in the position to assist with supplemental financing in order to complete the repairs at Windmill Run
>
> 2) Ownership is discussing the possibility of pursuing a Qualified Contract for the sale of the property. Based on a cursory review of the documents, it appears the option chosen has several intermediate time frames for a specific type of qualified buyer to purchase.  If I read this correctly, the process could be up to 2 years, but cannot start until AFTER the 15th year of the compliance period.
>
> 3) As a team, the source of funds for the repairs still needs to be determined, but will need to be addressed soon.  I still believe with a sign that improvements are coming to the property, management will be able to increase the street rents by 15% from the current levels and increase renewal rates at a more measured pace.  These revenue improvements should provide the opportunity to show the capabilities of the property and enhance the ability to refinance the property, recoup some advances, finish improvements and increase Net Cash Flow which ultimately flows to the partnership.

(Defendants Exhibit 37).

33

Breen testified that, in the January 20, 2015 conversation, he disagreed with the reports regarding paving and asphalt.  He testified that his primary concern regarding the January 20, 2015 conversation was that there were 18 vacant units, and that he intended to make a cash infusion in order to "begin turning those units and getting them available for rent." He testified that he said during that conversation that he believed discussions would continue regarding the cost of repairs.  (Tr. 12/12/2016, at p. 164-165).

2.   First Pre-Negotiation Letter

On February 4, 2015, Johnson sent an email to Debtor attaching a proposed form of pre-negotiation letter ("PNL"). (Defendants Exhibit 39).  Fonseca and Walther signed the February PNL on February 12, 2015.  (Defendants Exhibit 40).  Although the letter is on Oak Grove letterhead, Johnson testified that a PNL is a Fannie Mae form letter.  (Tr. 11/29/2016, at p. 59).  The February PNL provides in pertinent part:

Dear Mr. Fonseca & Mr. Walther:

You have asked on behalf of Borrower to meet with the undersigned in order to discuss the problems associated with this loan.  In order for any meeting to be effective, enclosed is a list of information we require for analysis of the loan.  As we will need some time to analyze this information, the information must be received by us on or before the close of business on March 6, 2015.

* * *

34

None of the oral or written discussions or other
communications relating to the Loan, to its terms or
provisions, or to efforts to resolve any problems
associated with the Loan and the Loan Documents shall
be effective to modify, extend or amend in any manner,
the rights and remedies of Fannie Mae under the Loan
Documents.  Each term and provision of the Loan
Documents shall be fully enforceable in accordance with
its terms.

* * *

Also, if Fannie Mae, in its sole and absolute
discretion, deems circumstances to so warrant, Fannie
Mae's policy is to pursue "parallel paths," whereby it
pursues its rights and remedies under the loan
Documents while at the same time discussing the loan.
Accordingly, Fannie Mae reserves any and all rights and
remedies it may possess at law or in equity.  By
scheduling this meeting, and exchanging communications
related to the Loan and the Loan Documents, neither
Fannie Mae nor Servicer (I) waive any rights they may
have which arise from the Loan Documents or the actions
or inactions of Borrower; or (ii) agree to refrain from
or delay the exercise of any of Fannie Mae's rights or
remedies under the Loan Documents.

* * *

Pursuant to the foregoing, we are willing to hold these
discussions with you upon the following terms and
conditions:

* * *

1.  Rights and Remedies Not Affected.  Borrower hereby
acknowledges that Fannie Mae is entitled to exercise
any and all rights and remedies set forth in the loan
Documents in accordance therewith, at law or in equity.
Fannie Mae's rights and remedies shall not be affected
or impaired in any way by reason of any or all of the
following: (I) holding discussions with Borrower; and
(ii) exchanging any correspondence among the parties.
Any and all of the foregoing shall not be deemed to act
as a waiver of, or otherwise preclude, the exercise of
any rights or remedies of any of the parties under the
Loan Documents or at law or equity, or from commencing
or continuing the exercise of such rights or remedies.

2.  <u>No Oral Modifications</u>.  No modification, extension, or amendment agreement arising out of any discussions or correspondence pertaining to the loan or Loan Documents shall be effective or binding unless in writing in a form approved by Fannie Mae.  Each and every oral agreement to modify, extend or amend the terms and provisions of the Loan Documents is entirely unenforceable, and Borrower hereby waives any reliance on (I) any and all oral agreements to modify, extend or amend the terms and provisions of the loan Documents and (ii) the matters, conditions, or events related to any and all such oral agreements to modify, extend or amend the Loan Documents.

                          * * *

5.  <u>Termination of Discussions</u>.  Borrower or Fannie Mae may, in its sole and absolute discretion, unilaterally discontinue the discussions at any time for any reason without any liability whatsoever to the other party by reason of any such discontinuation or termination.

6. <u>Loan Documents</u>.  Borrower acknowledges that each of the Loan Documents is valid, fully enforceable in accordance with its terms, and evidences legal and binding obligations which are in full force and effect.

7.  <u>Authorized Representatives</u>. Christopher Beauregard is authorized on behalf of Fannie Mae and Bill Johnson is authorized on behalf of Servicer to hold discussions with you.  In connection with the scheduling of the meeting, we must be advised by Borrower as to the identity of their respective authorized representatives. Such authorization remains in effect until changed in writing by the applicable party.

8.  <u>Lender Relationship; Participation: Credit Loss Insurance</u>.  Borrower acknowledges that Fannie Mae is the holder of the note executed in connection with the loan and that the Servicer is servicing the Loan under its lender/servicer agreement with Fannie Mae. Borrower further acknowledges that although Fannie Mae may be the sole holder of the note, other parties such as Servicer, loan participants. credit loss insurance, REMIC, or other mortgage investors, may share in the losses incurred on the loan; however, such agreements and relationships, if any, are between Fannie Mae and such third parties, and Borrower is neither a party to,

> nor a beneficiary of, any such agreements or
> relationships.

(Defendants Exhibit 40).

Fonseca testified that he and Walther signed the
February PNL, operating under the assumption that they were
working productively with Fannie Mae and Oak Grove to reach a
mutually agreeable solution on the issue of the maintenance
items.  (Tr. 11/18/2016, at p. 64).

Despite the appearance that Fannie Mae and Oak Grove
were engaging in formal good faith negotiations through the
issuance of the February PNL, they had an ulterior motive in
doing so.  On February 3, 2015, one day prior to the issuance of
the February PNL, Johnson emailed Kevin Sullivan and Hunter
Atteberry,[16] stating:

> I received another request from the Borrower last night
> asking for some type of modification.  This is an MBS
> deal, so no options available.
>
> I discussed with Chris Beauregard this morning and
> Chris agreed with my course of action.  Based on a
> recent conversation it is possible there has been a
> transfer of the LP interest in this deal.  Because of
> this possibility, the PNL will allow us to determine if
> this occurred and will afford us the opportunity to
> create a demand for funding of all deferred maintenance
> issues.  Based on recent opinions from Fannie, the cure
> period must be offered before recourse is activated.
> In order to avoid recourse, they will need to fund

---

[16]Johnson testified that Sullivan is Johnson's boss, the
director of servicing for Oak Grove.  (Tr. 11/28/2016, at p.
161).  Johnson testified that Atteberry is the deputy chief asset
manager for Oak Grove, one of Johnson's peers.  (Tr. 11/29/2016,
at p. 35).

approx. $300K for deferred maintenance.

Any thoughts on the letter?  The 2 KPs are listed, however, Mark Breen has identified himself as the only person with money as a limited partner.  That is the term that leads me to believe there has been a transfer.

(Windmill Exhibit 37).

Johnson testified that he believed there had been a transfer of the limited partner's equity interest to Breen.  (Tr. 11/29/2016, at p. 45).  He testified that he believed the transfer possibly triggered recourse liability against Debtor's principals.  (Tr. 11/29/2016, at p. 46).  He testified that he now has no recollection of the conversations in January, 2015, or in February, 2015 leading up to the issuance of the February PNL. (Tr. 11/29/2016, at p. 43-44).

Johnson testified that the opportunity he believed was afforded to Fannie Mae and Oak Grove based on what he believed to be a transfer of the limited partner's equity interest was to trigger recourse liability against Debtor's principals.  (Tr. 11/29/2016, at p. 50-51).[17]

Johnson testified that the recourse liability against Debtor's principals created leverage for Fannie Mae and Oak Grove to negotiate a better position as against Debtor and its

---

[17]Fannie Mae subsequently filed suit against Fonseca and Walther in the United States District Court for the Southern District of Texas, on December 30, 2015, in C.A. No. 3:15-cv-00359.  The suit was dismissed on May 10, 2016.

principals.  (Tr. 11/29/2016, at p. 56).

###### 3.   The Push Toward Foreclosure

Seeing an opportunity not only to trigger recourse liability against Debtor's principals but also to obtain the property free of the LURA, Fannie Mae and Oak Grove manufactured an  opportunity to foreclose.  If they foreclosed, the property would no longer be held to rents for low and middle income tenants.  Oak Grove or Fannie Mae, or their successor, could charge market rents.  Despite the fact that the RRSA provides for Fannie Mae to perform a PNA only between the sixth month and the ninth month of the tenth year after execution of the RRSA (see Defendants Exhibit 3), Fannie Mae commissioned the preparation of a "Property Condition Assessment" ("PCA") by f3.  The PCA report is dated March 23, 2015, and states that the date of the assessment was March 11, 2015.  (Windmill Exhibit 42).  The date on which the March PCA was actually commissioned is not in evidence.

Johnson testified that the terms "Physical Needs Assessment" and "Property Condition Assessment" are used interchangeably.  (Tr. 11/30/2016, at p. 80).  That testimony is self-serving (if the March PCA was a PNA under the loan documents, it would appear to trigger the adjustment of the Replacement Reserve under the RRSA for the remainder of the loan term in an amount sufficient to make the required repairs) and is

not credible, because the RRSA provided that Fannie Mae could order a PNA only between the sixth and ninth months of the tenth year, and this followed the 2012 PNA by just three years.

The March PCA identifies items for repair or replacement, and assigns an estimated cost to each of the items. The items were divided into several categories:  immediate needs; critical repairs, which were identified as items recommended for completion within six months; and deferred maintenance, which were identified as non-recurring capital items typically recommended for completion within 12 months.  (Windmill Exhibit 42).

In the immediate needs category, f3 identified two items:  the absence of batteries in smoke alarms, and the presence of mold apparently caused by poor tenant housekeeping practices.  The cost assigned to this repair by f3 was zero. (Windmill Exhibit 42).

In the critical repairs category, f3 identified one item:  twelve vacant units that needed to be made ready for renting.  The cost assigned to this repair by f3 was $12,000.[18]

In the deferred maintenance category, f3 identified five items.  The first item addressed the asphalt driveways and parking areas.  The repair recommended by f3 was the removal of

---

[18]Noakes testified that the apartment management reported that, by the time the March PCA report was issued, the units had been leased.  (Tr. 11/3/2016, at p. 75).

damaged areas, stabilization of the soil base, repair, sealing, and re-striping of those areas. The cost assigned to this repair by f3 was $168,000. The second item addressed pedestrian walkways. Although repair was recommended, the cost assigned to this repair by f3 was zero. The third item addressed exterior cladding and finishes. The repair recommended by f3 was the replacement of damaged siding and trim components, power washing of all buildings, and repainting of all buildings. The cost assigned to this repair was $68,400. The fourth item addressed roof gutters. The recommendation of f3 was the installation of gutters and downspouts on all buildings. The cost assigned to this item by f3 was $28,500. The fifth item addressed dwelling unit bathrooms. The repair recommended by f3 was the removal of all bathroom vanity units, and replacement with wheelchair-accessible units. The cost assigned to this item by f3 was $51,000. The total cost identified by f3, of items it placed in the deferred maintenance category, was $315,900. (Windmill Exhibit 42).

Breen, who has extensive experience in the business of rehabilitating apartment complexes, testified that he believed the total cost of the repairs for the items identified in the March PCA was within a range from $100,000 to $175,000. (Tr. 12/12/2016, at p. 73). He testified that if the parties had come to a meaningful resolution as to the scope of work necessary on

41

the site, he would have deposited whatever funds were necessary to get the work done.  (Tr. 12/12/2016, at p. 74).[19]

However, Oak Grove appears to have been more interested in foreclosure than in getting the work done.  On April 14, 2015 at 8:49 a.m., Johnson emailed his boss, Sullivan, addressing a loan modification proposal apparently made by Fonseca.  In the email, Johnson stated that he wanted to determine Oak Grove's position before communicating with Fannie Mae about the proposal. (Windmill Exhibit 116).

On April 14, 2015, at 1:13 p.m., Johnson again emailed Sullivan.  In the email, Johnson stated that he had discussed the proposal with Beauregard.  He stated that Fannie Mae was willing to work on a loan modification, with four months of forbearance, a purchase of the loan from the MBS pool, and three to five years of interest only, at an interest rate sufficient to allow the deal to break even.  He stated that a call would be scheduled later that week with Beauregard and Debtor's representatives.[20]

Notwithstanding Fannie Mae's communication to Johnson that Fannie Mae was willing to negotiate a loan modification,

---

[19]As noted below, Breen ultimately did contribute the funds, and got all the work done, plus additional work, for a cost of between $160,000 and $170,000.

[20]There is no evidence that such a call took place.  The next communication after the April 14, 2015 emails, other than the demand letter addressed below, appears to have taken place on or about May 7, 2015, as addressed below.

Johnson did not communicate this to Debtor or its principals. So
what Debtor and its principals were left with was Johnson's
previous statement in Windmill Exhibit 37 (an email dated
February 3, 2015, quoted above) that no loan modification options
were available.  (Tr. 11/30/2016, at p. 114).  Johnson testified
that it was not his role to address modification terms.  (Tr.
11/30/2016, at p. 115).  However, under the executed February
PNL, Johnson was identified as a person authorized to hold
discussions with Debtor as to negotiations.  (Defendants Exhibit
40).  It is clear in the record that he did so.  (See, e.g. Tr.
11/18/2016, at p. 94; Tr. 11/29/2016, at p. 7; Windmill Exhibit
43).

        Johnson was aware that Debtor had access to a person
with sufficient money, Breen, who was willing to spend a
significant amount of money to repair the Debtor's property, as
long as that money was not impounded for other purposes.
Nonetheless, on April 15, 2015, Johnson sent a demand letter to
Fonseca and Walther stating that Debtor was in default of its
repair obligations.[21]  In the letter, Johnson described the March
PCA as a PNA.  He stated that each of the items covered under
what he termed the PNA constituted "Additional Replacements"
under Paragraph 5.1(d) of the RRSA.  In the letter, Johnson

---

        [21](i.e., not in default as to payments of principal and
interest).

demanded that Debtor deposit $317,900 into the Replacement Reserve account on or before May 1, 2015.  He stated that if the Debtor failed to deposit the $317,900, it would be considered a monetary default under the loan documents.  (Windmill Exhibit 43).  Noakes testified that Oak Grove made the demand on behalf of Fannie Mae.  (Tr. 11/15/2016, at p. 46).

However, as addressed below, Fannie Mae did not declare a default under the loan documents before July 24, 2015.  The court finds that Johnson's purpose in sending the April 15, 2015 demand letter was not to obtain the repair of the property, but rather, as stated previously in Windmill Exhibit 37, to trigger the notice and cure provisions that would create recourse liability against Debtor's principals.

Johnson testified that he made the deliberate decision not to send the April 15, 2015 letter to NAPICO.  (Tr. 11/30/2016, at p. 77).[22]

Fonseca testified that Debtor disagreed with the size and scope of the items identified in the March PCA.  (Tr. 11/16/2016, at p. 77).  He testified that he was told by Johnson that if Debtor deposited the funds, they might not be released for repairs, because Oak Grove may have wanted to hold the funds

---

[22]Johnson later testified that his decision not to notify NAPICO was an oversight.  (Tr. 12/6/2016, at p. 73).

44

for other items.   (Tr. 11/16/2016, at p. 77-78).[23]

On or about May 7, 2015,[24] there was a conference call between Fonseca, Breen, Walther, Cichon, Adrienne Bussell,[25] Johnson, and Beauregard.   (Tr 11/18/2016, at p. 81).   After the conference call, on May 8, 2015, Johnson sent an email to Fonseca, Breen, Walther, Cichon, Bussell, and Sullivan.[26]   The email "identified several items to be ready" prior to the next discussion, which was scheduled to take place on June 10, 2015. Those items, as stated by Johnson, were:

> 1) For the American Communities team, pro-forma numbers that will allow for rent growth at the property based on the possibility of TDHCA agreeing to a release of a percentage of units from the income restrictions, the possibility of increasing rents for voucher holders and the impact that improved curb appeal and improved resident profile will have.

---

[23]The court notes that this testimony is consistent with the approach Johnson took in his December 11, 2014 email to Capstone personnel, addressed above, stating limits of $13,500 for 2015, $19,000 for 2016, and $26,000 for 2017, for disbursements from the Replacement Reserve account.

[24]The May 8, 2015 email addressed below describes a previous call "on Thursday." The court takes judicial notice that May 8, 2015 occurred on a Friday, thus the reference to "on Thursday" most likely refers to May 7, 2015.

[25]Fonseca testified that Bussell previously was an asset manager at American Communities who was the staff person responsible for Debtor's property. He testified that she is no longer employed by American Communities. (Tr. 11/18/2016, at p. 78-79).

[26]Johnson omitted Beauregard from the distribution.  On May 9, 2015, Johnson forwarded the May 8, 2015 email to Beauregard. (Windmill Exhibit 44).

2) Mr Breen and John were going to re-visit the property, assess the current conditions and have discussions with the contractors to determine the cost for the scope of work identified in the PNA. Additional work items have been identified, and you were going to work on an implementation plan for unit upgrades.

3) Mark Breen, Frank and Mark Walther were going to have discussions to determine the interest rate that would provide the most relief for the property with the understanding that final rates are to be determined by Fannie Mae.

4) Chris Beauregard was going to complete an analysis for Fannie Mae on a plan for 4 months of interest only at the current interest rate and then possibility of a defensive refinance or modification with 2-3 years of interest only at a rate to be determined. Chris hopes to provide some initial feedback the week of the 11th of May so that the ownership team can have substantive discussions.

5) I am scheduled to be in the Houston area May 26-27 with the intention of visiting Windmill Run. My last stop was in September 2014 and I would like to be able to see the property prior to the call.

(Windmill Exhibit 44).

Fonseca testified that, at the time Fonseca received Johnson's email of May 8, 2015, no one at Oak Grove had told him that a loan modification was not an option. (Tr. 11/18/2016, at p. 80). On examination by opposing counsel, Johnson testified that it was a reasonable impression for Debtor's representatives to believe that Johnson was a person to communicate with regarding a loan modification. (Tr. 11/30/2016, at p. 94).

There is no evidence as to whether Johnson actually visited the property in May, 2015. Johnson testified that he

46

does not have a recollection of having done so.  (Tr. 11/30/2016, at p. 104).[27]

On May 13, 2015, there was an additional call.  The participants on the call are not identified, but appear to have included Johnson, Fonseca and Bussell.  After the call, Fonseca stated in an email what he believed Johnson had described on the call.  Johnson responded, with comments.  On the same date, Fonseca forwarded Johnson's comments to Breen.  Fonseca's original email, with Johnson's comments[28] provides in pertinent part:

> Before I send out an email to the relevant parties on our side I want to make sure I'm clear on what you believe is potentially on the table in connection with the Windmill Run loan. Here is a summary of what I believe you described:
>
> • The current loan would be initially modified to be "interest only" based on the existing 6.587% loan interest rate for a period of four months.  This is necessary in order for Fannie to be able to remove the loan from the current pool in which it sits.
>
> • Once removed from the pool, then Fannie will have the ability to modify the loan.  Currently, the modified loan rate would be between 4.5% and 5%, interest only for a period of three to four years (*As proposed by Chris B during our call, 2-3 years*).  It may be possible to negotiate a longer

---

[27]Johnson testified that he visited the property in September, 2014, and then next in June, 2015.  (Tr. 12/6/2016, at p. 104).

[28]Identified below in italics--on the original exhibit, the portion written by Fonseca appears in blue text, and Johnson's comments appear in red text.  (Windmill Exhibit 113).

interest only term however, this would have to be
determined.  The current loan maturity would
remain the same as of this time.

- Fannie would look to see a pro forma showing a 10%
increase in rental revenue over some period of
time?? I was unclear as to what time period they
want to see the 10% growth achieved so can you
please respond to this item specifically and
confirm what time period are they looking for?
Are they looking to see 10% income growth after
year one of the modification?  Or over the
modified loan rate period (i.e. three to four
years)? *This 10% EGI increase is a number I used
as an example.  Fannie Mae has not issued/
discussed any requirements regarding income growth
rates.  I believe they will be looking for what
you expect to occur and the impact of property
operational increases plus interest rate reduction
will have on deal viability.*

Also can you confirm what happens after say year four
and prior to the existing 2021 maturity date with the
modified rate? Does it stay the same and simply become
fully amortizing again?  *Those terms have yet to be
defined, but I would expect that after the I/O period,
the rate will remain the same (4.5- 5%) and the loan
will begin to amortize until maturity. What I do not
know is if the maturity date will be extended in order
to give the property time to stabilize and improve
performance.*

(Windmill Exhibit 113).[29]  Johnson's role in sending the May 8,

2015, and the subsequent email of May 13, 2015 (contained in

Windmill Exhibit 113) indicates that he was continuing to work on

modification options.

Oak Grove was continuing to discuss internally the

subject matter of the May 13, 2015 call.  On May 18, 2015,

---

[29]The exhibit is labeled as "Plaintiffs Adversary 113."  The
reference to "I/O" in the text is the interest only period.  (Tr.
11/21/2016, at p. 193).

Johnson emailed Sullivan and Atteberry, requesting to "discuss the latest Fannie update on the possible modification of this loan and repercussions." (Windmill Exhibit 118).[30]  Johnson testified that the repercussions he had in mind when he wrote the email were negative implications for Oak Grove. (Tr. 12/1/2016, at p. 57).

On June 15, 2015, Fonseca submitted a written proposal to Johnson, with copies to Sullivan, Beauregard, Breen, and Walther.  The proposal called for the lender to reduce debt payments to interest-only at a rate of 2.5 percent through the 2021 maturity date of the loan.  The proposal called for funding by Debtor or its principals of $100,000 of the $317,900 addressed in the March PCA, upon approval of the proposal, with all funds to be used to remedy the "immediate repairs" section of the March PCA.  The proposal called for funding an additional $100,000 after the initial $100,000 was spent, net of property cash flow generated from operations.  The proposal called for funding the balance, net of property cash flow generated from operations, during the final phase timeframe.  The proposal called for cash flow generated from operations after the completion of repairs to reimburse the advances made to cover the repairs, then to be used to pay interest, and then principal.  The proposal called for a forgiveness of any interest owed until all advances for repairs

---

[30]This exhibit was marked by the court as "PX 118.").

49

had been reimbursed.  (Windmill Exhibit 45).

Johnson testified that he believes the proposal identified in Fonseca's June 15, 2015 letter was a counteroffer to an offer made by Fannie Mae.  (Tr. 11/30/2016, at p. 110).  He testified that he believed the terms proposed to be counter to the terms listed as discussion items in Windmill Exhibit 113. The court finds that the discussion items in Windmill Exhibit 113 were not an offer.  The court finds that the proposal identified in Fonseca's June 15, 2015 letter was an offer, and was not a counteroffer to an offer made by Fannie Mae.

Both Johnson and Noakes testified that the proposal identified in Fonseca's June 15, 2015 letter was unacceptable to Fannie Mae.  (Tr. 11/30/2016, at p. 110; Tr. 11/16/2016, at p. 173-174).

Fonseca testified that no one at Oak Grove or Fannie Mae formally responded to the proposal identified in Fonseca's June 15, 2015 letter, or called to discuss it.  (Tr. 11/18/2016, at p. 91).  Fonseca testified that what he hoped, when writing the letter, was to develop terms that would get to 2017, when the amount of the prepayment penalty would be significantly reduced, and look to refinance the property to make Fannie Mae whole. (Tr. 11/28/2016, at p. 24).

On June 23, 2015, Johnson conducted his next inspection of the property.  Despite the negotiations that had taken place

50

from February, 2015 through June 15, 2015, including
representatives of Debtor's ownership, and Oak Grove (including
Johnson) and Fannie Mae, Johnson wrote in his inspection report:
"Issues have been developing over past several years with no
attention by owner." (Windmill Exhibit 46).

Johnson's June 23, 2015 report also indicates:
"Property is currently assigned to Fannie Mae SAM." (Windmill
Exhibit 46).[31]

Noakes testified that once a loan comes to SAM, loan
modifications are not an option. (Tr. 11/16/2016, at p. 41). He
testified that his job is to pursue resolution of the situation
based on Fannie Mae's contractual and statutory rights. He
testified that a loan which reaches him is considered to be in
default. (Tr. 11/8/2016, at p. 10). He testified that he is the
"end of the line" for loans. (Tr. 11/8/2016, at p. 12).

On July 7, 2015, Fannie Mae requested a broker's
opinion of value with respect to the property. (Windmill Exhibit
16 - 506(b)). The broker's opinion of value submitted to Fannie
Mae by Lupe Olivares of Transwestern is dated July 21, 2015. It
shows a value of $2.79 million as-is, and $3.17 stabilized.
(Windmill Exhibit 47). Noakes testified that Fannie Mae

---

[31]Noakes several times in his testimony identified "SAM" as
the Special Assets Management department at Fannie Mae. (See,
Tr. 11/3/2016, at p. 52; Tr. 11/3/2016, at p. 69; Tr. 11/8/2016,
at p. 76).

51

routinely gets broker's opinions of value for Fannie Mae's
internal purpose of determining any need to reserve for
anticipated losses.  (Tr. 11/3/2016, at p. 98).[32]

Although Fannie Mae had internally rejected the
proposal contained in Fonseca's June 15, 2015 letter, and was
moving toward foreclosure beginning no later than June 23, 2015,
Fannie Mae had not notified Debtor or any of Debtor's principals
that it was doing so.

On July 21, 2015, Fonseca emailed Johnson, with copies
to Breen, Cichon, and Bussell, asking the status as to Fonseca's
June 15, 2015 letter.  (Windmill Exhibit 50).  Johnson replied on
July 23, 2015, stating:  "The handling of this deal has been
assigned to Fannie Mae Special Asset Management.  Future
discussions regarding the status of the loan will have to involve
SAM."  Johnson's reply email suggested a date for a joint call of
July 30, 2015.  (Windmill Exhibit 51).  Neither Fannie Mae nor
Oak Grove is shown to have communicated with Debtor between June
23, 2015, the first date on which it is clear in the record that
the loan was assigned to SAM, and July 21, 2015, the date of
Fonseca's email to Johnson.

---

[32]Noakes testified that the July 7, 2015 email was not the
email by which Fannie Mae requested a broker's opinion of value.
He testified that a July 30, 2015 email requested a broker's
opinion of value.  (Tr. 11/9/2016, at p. 78).  The court finds
this testimony not credible, in light of the report's date of
July 21, 2016.

On July 24, 2015, Fannie Mae sent a letter titled
"Demand for Payment and Notice of Intent to Accelerate."  The
July 24, 2015 letter was signed by Amy Simpson, an attorney with
the law firm of Bryan Cave.[33]  The letter was sent by Federal
Express and by Certified Mail, Return Receipt Requested to
Debtor, at the addresses identified for Debtor in the LURA[34] and
to Fonseca and Walther, at the addresses identified for them in
the deed of trust.[35]  The letter was also sent to all three at
the address in the letterhead on which Fonseca's June 15, 2015
letter was written.[36]  (Windmill Exhibit 52).  The July 24, 2015
letter provides in pertinent part:

> On behalf of Fannie Mae, we hereby demand payment of
> all amounts due and outstanding under the Loan
> Documents, including, without limitation, attorneys'
> fees in collecting the defaulted amounts due to Fannie
> Mae, to the extent permitted under the Loan Documents.
> We hereby further notify you that unless all Current
> Defaults are fully cured and all amounts due are paid
> on or before 2:00 p.m., Dallas, Texas time, on August
> 7, 2015, Fannie Mae intends to and will accelerate the
> maturity of the Note and declare the unpaid principal
> balance, accrued and unpaid interest and all other
> amounts payable under the Loan Documents immediately
> due and payable in their entirety.  In that event

---

[33]Noakes testified that Simpson is an attorney at Bryan
Cave.  (Tr. 11/3/2016, at p. 34).  At a pretrial hearing on the
instant adversary proceeding, Michael Cooley, counsel for Fannie
Mae in the instant adversary proceeding and 506(b) motion, stated
that Bryan Cave frequently represents Fannie Mae.

[34](Windmill Exhibit 3).

[35](Defendants Exhibit 2).

[36](Windmill Exhibit 45).

> Fannie Mae intends to exercise any or all of the
> remedies provided in the Loan Documents or at law or in
> equity, which remedies may include, without limitation,
> commencing non-judicial foreclosure proceedings
> pursuant to the power of sale provisions under the Deed
> of Trust, and commencing an action for the immediate
> appointment of a receiver to, among other things,
> collect the rents and income from the Property.

(Windmill Exhibit 52).

The parties have stipulated that neither Fannie Mae
nor Oak Grove transmitted the July 24, 2015 letter to NAPICO.
(Docket No. 80, Adv. No. 15-8013, at Exhibit 1, Fact No. 44).

On July 27, 2015, Fonseca emailed Johnson, requesting
to know why the notice was sent while there had been no response
to the June 15, 2015 proposal. (Windmill Exhibit 53). Johnson's
response, emailed the same date, states in pertinent part: "Once
the deal was escalated to Special Assets at Fannie Mae, the
proposal was determined to be inadequate and by virtue of this
notice, rejected." Johnson continued to suggest a joint call for
July 30, 2015. (Windmill Exhibit 54).

On August 3, 2015, there was a conference call between
Breen, Fonseca, Johnson, and Noakes. Breen testified that,
during that conference call, he made several offers, including
escrowing the funds to do repairs to the property with a third
party, or to purchase the note at par, or to pay off the
outstanding balance of the note. (Tr. 12/12/2016, at p. 67-69).
Breen testified that Noakes refused to consider any offers
without the execution of a second PNL. (Tr. 12/12/2016, at p.

70).  The proposed second PNL is on Bryan Cave letterhead, bears
a date of July 31, 2015, and was forwarded to Fonseca, Walther,
and Breen, by email dated August 3, 2015.  (Windmill Exhibit
112).[37]  Breen testified that the form of PNL submitted to him by
Fannie Mae in July, 2015 differed from the February PNL in that
it would have required Debtor and its principals to admit that
Debtor was in default of its obligations to Fannie Mae, and to
agree that Fannie Mae had not done anything wrong under the loan
agreements.  (Tr. 12/12/2016, at p. 70-71).  Johnson testified
that Debtor did not sign the July PNL.  (Tr. 12/1/2016, at p.
46).

On August 4, 2015, Sullivan emailed Dave Williams,[38]
Brian Ranallo,[39] and Johnson, stating that Oak Grove and Fannie
Mae had had a conference call with the borrowers on August 3,
2015, and believed they would either default or file a bankruptcy
petition.  In the email, Sullivan recited that the borrower
asserted a value for the property of $1.2 million to $1.4
million, less the $300,000 in capital needs, and that Fannie Mae
had a broker's opinion of value asserting a value of over $2
million for the property.  (Windmill Exhibit 55).

---

[37]The exhibit is labeled as "Plaintiffs Adversary 112."

[38]Johnson testified that Williams was the CEO and one of the
owners of Oak Grove.  (Tr. 11/28/2016, at p. 175).

[39]Johnson testified that Ranallo was the COO of Oak Grove.
(Tr. 11/28/2016, at p. 176).

On August 5, 2015 and August 6, 2015, Sullivan requested and obtained information regarding the value of the property.  He requested year end financial reporting for 2014, quarterly financial reporting for the first two quarters of 2015, and the broker's opinion of value obtained by Fannie Mae. (Windmill Exhibit 57).

On August 6, 2015, Sullivan emailed Johnson, regarding a conference call.  The email states in pertinent part that Oak Grove had made loss sharing calculations using the borrower's opinion of value, Fannie Mae's broker's opinion of value, June property reports, and the year end 2014 financial reports. (Windmill Exhibit 58).

Noakes testified that Oak Grove had an option to purchase the property within 10 days after foreclosure.  (Tr. 11/7/2016, at p. 57).

Noakes testified that Fannie Mae and Oak Grove are parties to an agreement that provides for loss sharing with respect to Debtor's loan.  (Tr. 11/16/2016, at p. 4).  Johnson testified that he makes loss sharing calculations for Oak Grove on a Fannie Mae form, using a formula approved by Fannie Mae. (Tr. 12/1/2016, at p. 21).  Johnson testified that the formula uses as inputs the date of the note, the date of maturity of the loan, the date for yield maintenance, the interest rate, the current unpaid principal balance, and the value of the property.

(Tr. 12/1/2016, at p. 21-22).

Johnson testified that Oak Grove only owns property to offset potential losses. (Tr. 12/7/2016, at p. 29). However, he admitted that Oak Grove acquires property and holds it until the value of the property exceeds Oak Grove's equity in the deal. (Tr. 11/29/2016, at p. 14).

On examination by opposing counsel, Johnson testified that, with a property subject to a land use restriction, like the LURA in the instant case, the property increases in value by virtue of getting rid of the land use restriction. (Tr. 11/28/2016, at p. 195).

Johnson testified that, since he has been employed by Oak Grove, Oak Grove has purchased two properties at foreclosure. (Tr. 12/6/2016, at p. 22). He testified that as to one property, in Minnesota, which was operated as an assisted living facility, Oak Grove concluded that the property could be repositioned as a LIHTC property with lower overhead costs, such that Oak Grove would realize a gain on the property. (Tr. 12/6/2016, at p. 23). He testified that as to a property in Michigan, Oak Grove purchased the property because it anticipated a future increase in value of the property due to destruction of a LURA in foreclosure. (Tr. 12/6/2016, at p. 24).

Johnson testified that Oak Grove has made demands of borrowers as to other properties, in Oklahoma City, Oklahoma, and

Louisville, Kentucky, asserting not that the loan payments were in default, but rather demanding deposits into reserve accounts. (Tr. 11/28/2016, at p. 188-189).[40]  He testified that, with respect to the property in Oklahoma City, Oak Grove negotiated with the property owner after making a demand for a $750,000 deposit to address deferred maintenance issues.  He testified that the owner ultimately deposited $600,000 and repaired the property.  He testified that, with respect to the property in Louisville, the property went into foreclosure.  (Tr. 12/5/2016, at p. 85).

The court finds that Oak Grove's drive toward foreclosure was motivated, in part, if not entirely, by what it perceived to be an opportunity to acquire the property free of the LURA in order to increase the value of the property and realize a profit.

By letter dated August 10, 2015, Fannie Mae, through Simpson, gave notice of acceleration of the note.  Fannie Mae also gave notice of a foreclosure sale of the property, scheduled to take place on September 1, 2015.  The notice was sent by Federal Express and by Certified Mail, Return Receipt Requested, to the same persons and entities, and at the same addresses, as those identified above with respect to the July 24, 2015 letter.

_____

[40]These were properties with mortgages held by Fannie Mae. (Tr. 12/5/2016, at p. 84-85).

(Windmill Exhibit 60).

The parties have stipulated that neither Fannie Mae nor Oak Grove transmitted the August 10, 2015 letter to NAPICO. (Docket No. 80, Adv. No. 15-8013, at Exhibit 1, Fact No. 46).

On August 13, 2015, Fannie Mae requested an appraisal of the property. The engagement letter required the appraiser to provide an electronic first draft of the appraisal to Fannie Mae on or before August 28, 2015. (Windmill Exhibit 33 - 506(b), at p. 119).

Noakes testified that Fannie Mae requested the appraisal because its department that obtains ownership of properties after a foreclosure needs a value of the property. (Tr. 11/3/2016, at p. 107).

On August 26, 2015, the appraiser, Tim Cole of Pacific Southwest Valuation, provided an appraisal report as to the property to Fannie Mae. (Windmill Exhibit 33 - 506(b), at p. 1). The August 26, 2015 appraisal report stated a value, as of August 20, 2015, of $1.8 million, as is, based on restricted rents, or $3.35 million, in its condition as of August 20, 2015, if the property owner were to charge market rate rents. (Windmill Exhibit 33 - 506(b), at p. 2). Each of the values stated in the report reflects a deduction of $350,000 for deferred maintenance items. (Windmill Exhibit 33 - 506(b), at p. 115).

On August 18, 2015, at the request of Noakes and Johnson, f3 performed what it identifies as an additional PNA. The August PNA[41] report, dated August 31, 2015, identifies what it terms immediate needs, with a cost estimate totaling $338,700. The items identified are roof repairs, at an estimated cost of $5,000, repair and installation of gutters and downspouts, at an estimated cost of $28,500, power washing and painting, at an estimated cost of $60,000, renovation of three units, at an estimated cost of $18,300, removal and replacement of all bathroom vanity units, at an estimated cost of $51,000, repair of light fixtures, at an estimated cost of $1,900, repair and replacement of the parking lot, at an estimated cost of $120,000, repair and overlay of the sidewalks, at an estimated cost of $50,000, and replastering the pool, at an estimated cost of $4,000.  The August PNA describes the sidewalk repair as a life safety issue.  (Windmill Exhibit 61).

On August 26, 2015, Noakes emailed Johnson, regarding the scheduled foreclosure.  Noakes' email provides:

> Below is Fannie Mae's recommended bid instructions for the foreclosure presently set to occur September 1, 2015:

---

[41]Although nothing in the loan documents entitled Fannie Mae or Oak Grove to request an additional PNA, the court uses the term "PNA" to describe the August, 2015 report because it was identified as such in its title.

> • Establish a single credit bid representing total
> debt (not including yield maintenance) at Fannie
> Mae's foreclosure sale. Please let me know if you
> are in concurrence with the above bid
> instructions.
>
> In addition, in the event Fannie Mae is the prevailing
> bidder at the foreclosure, are you aware if Oak Grove
> is interested in purchasing the property from Fannie
> Mae in accordance with the 10-day post foreclosure
> option to purchase the REO? Otherwise, would Oak Grove
> be willing to waive its right to the 10-day option to
> purchase the REO?

(Windmill Exhibit 63).

Johnson forwarded Noakes' email to Sullivan.

Sullivan's response provides in pertinent part: "Our interest in

buying the property will certainly depend on the appraisal value.

We don't have that yet, correct? We will not waive our option.

Will it be valued as a market rate deal for loss sharing

purposes?" (Windmill Exhibit 63). Johnson conveyed Oak Grove's

decision to Noakes on August 27, 2015. (Windmill Exhibit 64).

The court infers from Noakes' email that Fannie Mae also

perceived an opportunity to profit from ownership of the

property.

    F.   <u>Overview of the Chapter 11 Case</u>

Debtor filed the petition in the instant Chapter 11

case on August 29, 2015. (Docket No. 1, Case No. 15-80319-G3-

11).

Capstone resigned as manager of the property, effective

as of the petition date. Celtic Property Management, an entity

61

controlled by Breen, began managing the property immediately thereafter.  (See Docket No. 170, Case No. 15-80319-G3-11).

On August 31, 2015, Fannie Mae filed a notice stating that it did not consent to Debtor's use of cash collateral, including rents from the property.  (Docket No. 3, Case No. 15-80319-G3-11).

On September 1, 2015, Debtor filed a motion for authority to use cash collateral, and an application to employ counsel.  (Docket Nos. 5, 6; Case No. 15-80319-G3-11).

The court held a hearing on Debtor's motion for use of cash collateral on September 8, 2015, and entered an agreed interim order authorizing use of cash collateral on that date.  (Docket No. 17, Case No. 15-80319-G3-11).  The court extended Debtor's interim use of cash collateral by agreed orders entered on September 15, 2015, October 13, 2015. January 7, 2016.  (Docket No. 27, 63, 124; Case No. 15-80319-G3-11).

Debtor filed its schedules and statement of financial affairs on September 23, 2015.  (Docket No. 41, Case No. 15-80319-G3-11).

On September 24, 2015, Fannie Mae filed a proof of claim, in the amount of $1,767,945.61, secured by the real property.  Fannie Mae attached to its proof of claim a narrative calculation as to the amount it asserted was owed, the note, the deed of trust, the RRSA, and the assignment.  (Windmill Exhibit

66).  Debtor has stipulated that the value of the property is at least $2.4 million, for the purposes of the instant 506(b) motion.  (Tr. 11/1/2016, at p. 17).

The total amounts reflected on the proof of claim are $1,602,317.02 principal; $8,493.17 in interest at 6.58%; $3,196.77 in default interest; $208,398.64 as a prepayment premium; $13,942.70 and $422.80 for the prepetition legal fees and expenses, respectively, of Bryan Cave; $4,900 for an appraisal fee;$500 for a BOV fee; $2,750 for a Phase I environmental fee; $2,750 for a PNA fee; and a credit of $80,445.49 for credited escrows swept to Fannie Mae.  (Windmill Exhibit 66).  Noakes testified that the $80,445.49 represents a credit for funds Fannie Mae swept from escrows held by Oak Grove for taxes, insurance, and unapplied funds.  (Tr. 11/9/2016, at p. 123).

The court takes judicial notice that Oak Grove has not filed a proof of claim.

On September 28, 2015, Fannie Mae filed a motion for relief from stay.  (Docket No. 46, Case No. 15-80319-G3-11).

On November 10, 2015, Debtor filed the original complaint in the instant adversary proceeding.  (Docket No. 1, Adv. No. 15-8013).

On November 12, 2015, Debtor filed a response to Fannie Mae's motion for relief from stay.  (Docket No. 82, Case No. 15-

63

80319-G3-11).

On November 30, 2015, the court granted Debtor's application to employ counsel, effective as of August 29, 2015. (Docket No. 90, Case No. 15-80319-G3-11).

On November 30, 2015, Debtor filed a motion for authorization of debtor in possession ("DIP") financing. (Docket No. 91, Case No. 15-80319-G3-11). The motion was amended on December 1, 2015. (Docket No. 93, Case No. 15-80319-G3-11).

On December 7, 2015, Debtor issued a subpoena to Olivares to testify at the trial on Fannie Mae's motion for relief from stay. (Docket No. 98, Case No. 15-80319-G3-11).

On December 7, 2015, Debtor gave notice of its intent to offer the July 21, 2015 broker's opinion of value and Olivares' curriculum vitae at the trial on Fannie Mae's motion for relief from stay. (Docket No. 99, Case No. 15-80319-G3-11).

On December 7, 2015, Debtor moved to exclude from evidence at trial on Fannie Mae's motion for relief from stay any appraisal evidence, on grounds no appraisal was produced in response to a discovery request. (Docket No. 100, Case No. 15-80319-G3-11).[42]

On December 16, 2015, Fannie Mae objected to Debtor's motion to authorize DIP financing. (Docket No. 105, Case No. 15-80319-G3-11).

---

[42]The motion was subsequently withdrawn.

On December 21, 2015, Fannie Mae filed an objection to Debtor's motion to exclude appraisal testimony.  (Docket No. 107, Case No. 15-80319-G3-11).

On December 28, 2015, Debtor filed a Chapter 11 plan of reorganization.  (Docket No. 110, Case No. 15-80319-G3-11).

On December 30, 2015, Debtor filed a Chapter 11 disclosure statement. (Docket No. 113, Case No. 15-80319-G3-11). Debtor amended the disclosure statement on January 18, 2016. (Docket No. 140, Case No. 15-80319-G3-11).

On January 6, 2016, Fannie Mae moved for a continuance of the hearing set January 21, 2016 on Debtor's motion for order authorizing DIP financing.  (Docket No. 119, Case No. 15-80319-G3-11).  Debtor responded to the motion for continuance on January 8, 2016.  (Docket No. 131, Case No. 15-80319-G3-11).

On January 15, 2016, the court entered an order granting in part the motion for continuance.  The order continued the motion for order authorizing DIP financing to a date and time to be set by the court, and left in place the other hearings set for January 21, 2016:  the continued cash collateral hearing and the trial on Fannie Mae's motion for relief from stay.  (Docket No. 138, Case No. 15-80319-G3-11).

On January 19, 2016, Fannie Mae filed an objection to Debtor's notice of intent to use Olivares' broker's opinion of value (commissioned by Fannie Mae).  (Docket No. 144, Case No.

15-80319-G3-11).

On January 20, 2016, Fannie Mae filed an objection to Debtor's use of cash collateral. (Docket No. 146, Case No. 15-80319-G3-11).

The trial on Fannie Mae's motion for relief from stay commenced on January 21, 2016, and was concluded on February 3, 2016. (Docket Nos. 146, 169; Case No. 15-80319-G3-11).

On February 3, 2016, Debtor filed an amended plan, and a second amended disclosure statement. (Docket Nos. 163, 165; Case No. 15-80319-G3-11).

On February 4, 2016, the court issued a Memorandum Opinion (Docket No. 170, Case No. 15-80319-G3-11) and a Judgment conditioning the automatic stay as to Fannie Mae on, inter alia, Debtor's maintaining the property to avoid the occurrence of "life safety" issues as identified in the PNA, and obtaining confirmation of a plan on or before June 7, 2016. (Docket No. 171, Case No. 15-80319-G3-11).

On February 18, 2016, Debtor filed a second amended plan, and a third amended disclosure statement. (Docket Nos. 176, 177; Case No. 15-80319-G3-11).

On March 17, 2016, Fannie Mae filed an objection to confirmation of the plan. (Docket No. 192, Case No. 15-80319-G3-11).

On March 18, 2016, Oak Grove filed an objection to Debtor's disclosure statement.  (Docket No. 195, Case No. 15-80319-G3-11).

On March 23, 2016, Debtor filed a third amended plan and a fourth amended disclosure statement.  (Docket Nos. 197, 198; Case No. 15-80319-G3-11).

The court approved Debtor's disclosure statement, by order entered March 24, 2016.  The order set May 5, 2016 as the date for the hearing on confirmation.  (Docket No. 204, Case No. 15-80319-G3-11).

On April 7, 2016, Fannie Mae moved to compel an inspection of the property, and for entry of a scheduling order regarding confirmation.  (Docket No. 210, Case No. 15-80319-G3-11).  Debtor responded to the motion on April 12, 2016.  The court heard argument on the motion on April 12, 2016.  At the hearing, the parties announced a stipulation, and agreed that the confirmation hearing would be held on May 17, 2016.

On April 26, 2016, Oak Grove filed an objection to confirmation of the plan.  (Docket No. 220, Case No. 15-80319-G3-11).

On May 10, 2016, Fannie Mae moved for continuance of the hearing set May 17, 2016 on confirmation of the plan, citing, inter alia, the Debtor's challenge to Fannie Mae's claim in the instant adversary proceeding.  (Docket No. 227, Case No. 15-

67

80319-G3-11).  On May 10, 2016, Debtor filed a response to Fannie

Mae's motion for continuance of the confirmation hearing.

(Docket Nos. 228, Case No. 15-80319-G3-11).  On May 11, 2016,

Fannie Mae filed a supplement to its motion for continuance.

(Docket No. 229, Case No. 15-80319-G3-11).  On May 12, 2016,

Debtor filed a supplement to its response to Fannie Mae's motion

for continuance.  (Docket Nos. 230, 231; Case No. 15-80319-G3-

11).  On May 13, 2016, Fannie Mae filed a reply to Debtor's

responses to its motion for continuance.  (Docket No. 232, Case

No. 15-80319-G3-11).  The court granted in part the motion for

continuance, by order entered on May 13, 2016.  (Docket No. 233,

Case No. 15-80319-G3-11).

        The hearing on confirmation of Debtor's plan commenced

on June 22, 2016, and continued on June 27-28, 2016.  At the

hearing on June 28, 2016, the parties announced that an agreement

had been reached on the pending objections.

        Debtor filed its third amended Chapter 11 plan, as

modified, on August 11, 2016.  (Docket No. 264, Case No. 15-

80319-G3-11).  The plan was confirmed, by order entered on August

15, 2016.  (Docket No. 267, Case No. 15-80319-G3-11).

        Debtor filed a Post Confirmation Certificate on August

25, 2016.  (Docket No. 272, Case No. 15-80319-G3-11).

        On August 30, 2016, Debtor filed a notice stating that

the effective date under the plan "has been achieved."  (Docket

68

No. 275, Case No. 15-80319-G3-11).

On September 16, 2016, Fannie Mae and Oak Grove filed the instant 506(b) motion. (Docket No. 276, Case No. 15-80319-G3-11). Fannie Mae and Oak Grove amended the 506(b) motion on October 4, 2016. (Docket No. 279, Case No. 15-80319-G3-11).

On October 7, 2016, Debtor filed an objection to the 506(b) motion. (Docket No. 280, Case No. 15-80319-G3-11).

On October 24, 2016, Debtor filed a motion to compel Fannie Mae to produce documents. (Docket No. 288, Case No. 15-80319-G3-11). Debtor amended its motion to compel on October 25, 2016. (Docket No. 289, Case No. 15-80319-G3-11). By order entered on October 27, 2016, the court granted in part the amended motion to compel. (Docket No. 292, Case No. 15-80319-G3-11).

By order entered on November 8, 2016, this court approved the first and final fee application of Debtor's counsel, for the period of August 29, 2015 through August 31, 2016, in the amount of $364,141.00 for fees and $18,189.22 in expenses, plus $6,500.00 for the preparation and notice of the final fee application. (Docket No. 302, Case No. 15-80319-G3-11).

G.   Fannie Mae's Motion For Relief From Stay

In Fannie Mae's motion for relief from stay, filed September 28, 2015, it asserted two alternative grounds for relief. First, it asserted that relief should be granted for

69

cause.  Fannie Mae asserted three grounds constituting cause: a) lack of adequate protection; b) what Fannie Mae asserted was "Debtor's continued failure to maintain the Property and the deteriorating condition of the Property (as shown by multiple Property Condition Assessments);" and c) that the instant Chapter 11 case represented a two party dispute which could be resolved in state court.  Second, Fannie Mae asserted that Debtor lacked equity in the property, citing a value of $1.5 million for the property, and asserted that the property was not necessary for an effective reorganization.  (Docket No. 46, Case No. 15-80319-G3-11).

On the date Fannie Mae filed its motion for relief from stay, September 28, 2015, it had received the July 21, 2015 broker's opinion of value it had requested from Olivares, stating a value of at least $2.79 million, and the August 26, 2015 appraisal report from Cole, stating a value of $1.8 million based on restricted rents, or $3.35 million based on market rents. Nonetheless, Fannie Mae contended in its motion for relief from stay that the value of the property was $1.5 million.[43]  Noakes testified that he reviewed the August 26, 2015 appraisal report with counsel, and determined that the property value was $1.5

_____

[43]Noakes testified that the August 26, 2015 appraisal report was a draft.  The court notes that it was not marked as a draft. Whether or not the appraisal report was a draft, Fannie Mae had it prior to filing its motion for relief from stay.

million.  (Tr. 11/7/2016, at p. 124-125).  Noakes testified that
he arrived at the $1.5 million value by subtracting the $338,700
addressed in the August 26, 2015 appraisal report from the
appraised value.  (Tr. 11/9/2016, at p. 17).[44]

Debtor's first discovery request to Fannie Mae and Oak
Grove took the form of a subpoena for documents under Bankruptcy
Rule 2004, filed on October 7, 2015.[45]  Although the subpoena did
not directly make reference to the pending motion for relief from
stay, several categories of documents requested (including "[a]ll
documents and ESI showing internal or external appraisals or
estimations of value of the property") appear calculated to lead
to admissible evidence on the motion for relief from stay.
(Docket No. 53, Case No. 15-80319-G3-11).

In Debtor's objection to the motion for relief from
stay, Debtor asserted that Fannie Mae could not meet its burden
of proof on the question of equity in the property, because it
had not produced in response to the document subpoena any
appraisals.  Debtor asserted that Fannie Mae was withholding the
appraisal on the grounds it was a consulting expert's opinion.

---

[44]Cole had already subtracted $350,000 in coming up with the
$1.8 million figure.  (Windmill Exhibit 33 - 506(b)).

[45]Debtor's response to the motion for relief from stay
asserts that it was served on October 6, 2015.  (Docket No. 82,
Case No. 15-80319-G3-11).

(Docket No. 82, Case No. 15-80319-G3-11).[46]

On December 7, 2015, Debtor issued a trial subpoena to Olivares. (Docket No. 98, Case No. 15-80319-G3-11). Debtor also filed a notice of intent to use Olivares' opinion of value pursuant to Federal Rule of Evidence 807. (Docket No. 99, Case No. 15-80319-G3-11). Debtor also moved to exclude from evidence any appraisal evidence offered by Fannie Mae, in light of the refusal of Fannie Mae to produce any appraisal reports. (Docket No. 100, Case No. 15-80319-G3-11).

Fannie Mae's response to Debtor's motion to exclude appraisal evidence stated that, before Debtor filed the motion, counsel for Fannie Mae advised Debtor's counsel that a final appraisal report would be produced after Fannie Mae obtained and reviewed the final appraisal report from a testifying expert. (Docket No. 107, Case No. 15-80319-G3-11).

An appraisal report prepared by Cole in December, 2015 was admitted into evidence at the hearing on the motion for relief from stay, by stipulation among the parties. (Docket No. 154, Case No. 15-80319-G3-11, at p. 6-7, 39, 63).[47]

---

[46]The court notes that Bryan Cave's time records attached to the instant 506(b) motion reflect an entry on October 22/2015 regarding the "need to re-engage appraiser as consulting expert." (Docket No. 276, Case No. 15-80319-G3-11, at Exhibit C, p. 21).

[47]Cole's appraisal report, dated December 14, 2015, is in evidence. (Windmill Exhibit 34 - 506(b)).

The court held a hearing on the motion for relief from stay for approximately six hours.  Keith Aurzada, of Bryan Cave, appeared on behalf of Fannie Mae.  Brian Kilmer, of Kilmer, Crosby & Walker, PLLC ("KCW") appeared on behalf of Oak Grove, but did not speak other than to announce his appearance. Approximately half of the trial time was occupied by the testimony of Cole and Olivares as to the value of the property. (Docket No. 154, 188, Case No. 15-80319-G3-11).

H.   Plan and DIP Financing Negotiations

The issues related to the DIP financing motion were mostly co-extensive with those related to the plan and disclosure statement.  Prepetition, as set forth above, Fannie Mae and Oak Grove had demanded a deposit of $317,900 into the Replacement Reserve account held by Oak Grove, in order to cover the costs of repair to the property pursuant to the March, 2015 PNA.  Breen offered at various times to deposit sufficient funds to make the repairs, as long as the funds were actually used for the repairs, and not held by Oak Grove for other purposes.  Those offers were rejected by Fannie Mae and Oak Grove.  Postpetition, On November 30, 2015, Debtor proposed DIP financing, to be provided by National Mortgage Investors LLC, Breen's entity, in advances aggregating $348,700, to cover the costs of repair to the apartment complex.  The proposed financing was to be secured by a superpriority lien, pursuant to Section 364(d) of the Bankruptcy

73

Code, on all of Debtor's real and personal property.  (Docket No.
93, Case No. 15-80319-G3-11).

Fannie Mae objected to the DIP financing motion
primarily on grounds Debtor had not described adequately how the
funds were to be used, and could not provide adequate protection
of Fannie Mae's interest in the property.[48]  (Docket No. 105,
Case No. 15-80319-G3-11).

Debtor's initial Chapter 11 plan provided, <u>inter alia</u>,
for the re-amortization of Fannie Mae's claim over 25 years, at a
reduced interest rate, and a balloon payment due after five
years.  The initial Chapter 11 plan provided that any DIP
financing would be paid pursuant to its own terms.  (Docket No.
110, Case No. 15-80319-G3-11).

Fannie Mae moved for a continuance of the hearing on
the DIP financing motion, asserting that Debtor's insiders had
not fully responded to discovery requests.  (Docket No. 119, Case
No. 15-80319-G3-11).  As Debtor correctly pointed out in its
response (Docket No. 131, Case No. 15-80319-G3-11), the discovery
was propounded in connection with the motion for relief from
stay, not the DIP financing motion.  (Docket No. 94, Case No. 15-
80319-G3-11).

_____

[48]This was notwithstanding that Fannie Mae had the July 21,
2015 broker's opinion of value provided by Olivares, and the
August 26, 2015 appraisal report provided by Cole.

Debtor's first amended Chapter 11 plan did not fundamentally change the proposed treatment of the proposed DIP financing or of Fannie Mae's claim.  However, it did provide for service of various documents on the proposed DIP lender, and provided for a contested hearing before this court on 60 days' notice in the event of any dispute regarding various non-monetary defaults.  The first amended proposed plan, which was filed on the date of the second session of the hearing on the motion for relief from stay, also provided generally for Breen to establish a third-party deposit account and deposit $100,000 on the effective date and annually thereafter for five years to fund distributions under the plan.  (Docket No. 163, Case No. 15-80319-G3-11).

Debtor's second amended plan provided for subordination of the proposed DIP loan to Fannie Mae's claim, provided for the funds advanced by Breen to be advanced to Debtor, rather than held in an account controlled by Breen, and required the parties to execute documents to retain the tax exempt structure created by the loan documents.  (Docket No. 176, Case No. 15-80319-G3-11).

Fannie Mae objected to the disclosure statement as to the second amended plan on grounds the plan was not confirmable. Fannie Mae asserted that the plan failed to identify what repairs would be made, and purported to enjoin Fannie Mae from declaring

75

a default based on the pre-confirmation condition of the
property; that the plan improperly provided for continuing
jurisdiction of this court; that the classification system for
classes of creditors was not reasonable and necessary; the plan
was not fair and equitable as to Fannie Mae's secured claim; and
that the plan violated the absolute priority rule by allowing the
prepetition equity holders to retain the ownership of Debtor.[49]
(Docket No. 192, Case No. 15-80319-G3-11).

Debtor's third amended plan, filed on March 23, 2016,
added a provision to the proposed treatment of Fannie Mae's claim
stating that the loan documents would be deemed amended to
conform to the terms of any final nonappealable judgment setting
the allowed claim.   (Docket No. 199, Case No. 15-80319-G3-11).

Debtor's disclosure statement regarding the third
amended plan was approved, by order entered on March 24, 2016.
(Docket No. 204, Case No. 15-80319-G3-11).   The confirmation
hearing originally was scheduled for May 5, 2016, but was
continued to May 17, 2016.   (Docket No. 217, Case No. 15-80319-
G3-11).

On April 22, 2016, Fannie Mae filed an objection to
confirmation.   Fannie Mae objected, on grounds the plan violated

---

[49]The court notes that, while the absolute priority rule
solely protects unsecured creditors, and Fannie Mae had asserted
a fully secured claim, Debtor has and had sought, in the instant
adversary proceeding, to invalidate Fannie Mae's lien.

the absolute priority rule; the plan was not fair and equitable
as to Fannie Mae's secured claim; the plan unfairly discriminated
against Fannie Mae by paying other claims during the first year
of the plan; the plan was not feasible; the classification under
the plan was improper; the court's retention of jurisdiction was
not proposed in good faith; and the solicitation was improper.
(Docket No. 220, Case No. 15-80319-G3-11).  Oak Grove filed an
objection to confirmation on April 26, 2016, raising the same
arguments as those raised by Fannie Mae.  (Docket No. 222, Case
No. 15-80319-G3-11).

        On May 10, 2016, Fannie Mae moved for a continuance of
the confirmation hearing, asserting:

> Fannie Mae believes a consensual plan can be reached if
> the confirmation hearing is continued until such time
> as (a) the repairs to the Property are made (the
> Debtor's expert opines that $155,138.00 in immediate
> repairs are required) and (b) the Adversary Proceeding
> challenging the secured status and amount of Fannie
> Mae's claim is resolved.  Granting the requested
> continuance will save not only the Court's time and
> resources but also the Debtor's estate and Fannie Mae
> thousands of dollars by eliminating the need to argue
> over issues that will be mooted if the requested
> continuance is granted.

(Docket No. 227, Case No. 15-80319-G3-11).

        Several iterations of responses and supplements to the
motion for continuance during the period from May 10-13, 2016
reflect a negotiation between Debtor and Fannie Mae of what
ultimately became the material terms of a plan modification and
resulted in a plan which was consensually confirmed.  (See Docket

Nos. 228-233, Case No. 15-80319-G3-11).  By order entered on May 13, 2016, the court granted a continuance of the confirmation hearing to June 22, 2016, and denied the remainder of the relief requested.  (Docket No. 233, Case No. 15-80319-G3-11).

The parties had not yet reached a consensual resolution of the confirmation issues on June 22, 2016.  The confirmation hearing commenced on that date, and continued on June 27, 2016. On June 27, 2016, the parties announced that they were trying to resolve the objections to confirmation.  (Docket No. 255, Case No. 15-80319-G3-11).

On June 28, 2016, the parties announced the basis of a consensual plan.  Debtor's third amended plan, as modified, was filed on August 11, 2016.  (Docket No. 264, Case No. 15-80319-G3-11).  The plan was confirmed by order entered on August 15, 2016. (Docket No. 267, Case No. 15-80319-G3-11).

I.   The Confirmed Plan

The confirmed plan provides, with respect to the claim of Fannie Mae:

> Amended Loan Terms: INITIALLY: The FNMA Claim shall be re-amortized over 25 years at a 5.5% interest rate. Commencing the first date of the first whole month next following the Effective Date and continuing on through the next following 59 months, FNMA shall be paid equal monthly installments of principal and interest of such re-amortized FNMA Claim. The balance owed on the FNMA Claim shall become due on the first date of the month immediately following the 59th such installment of principal and interest.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY: Upon the earliest date that both (A) the Claim of FNMA is Allowed, and (B) the Effective Date has occurred, at such time the monthly installments contemplated above shall be adjusted upward or downward if and as necessary to conform to the amount of such Allowed FNMA Claim.

To the extent requested, the Reorganized Debtor, FNMA, and Oak Grove shall execute or cause to be executed all necessary and appropriate documents to preserve the existing tax exempt structure created by the Loan Documents.

Upon the earliest date on which both of the following have occurred (1) The FNMA Claim becoming an Allowed Claim, and (2) the Effective Date: The Loan Documents and any other related loan documents will be deemed amended solely to conform to and reflect the terms of the Plan and any final un-appealable judgment setting the Allowed Claim, and shall otherwise remain in full force and effect. On the Effective Date, Exhibit B to the Deed of Trust shall be deemed amended solely to add the DIP Lender and Mark Breen as parties entitled to receive notice as contemplated in Section 31(d) of the Deed of Trust, and shall otherwise remain in full force and effect and survive confirmation. The Loan Documents shall not be modified by the Plan except as expressly set forth in the Plan. To the extent of any conflict between the Plan and a provision of the Loan Documents, the Plan shall govern.

FNMA must file its motion for allowance and payment of interest, fees, costs, and charges under Section 506(b) of the Bankruptcy Code within thirty (30) days after the Effective date of the Plan, and the Debtor and the DIP Lender reserve all rights in respect of any defenses or objections to such motion, including laches and timeliness, and any and all defenses whether they have been previously disclosed, filed, or heard by the Court.

To the extent that any post-Effective Date lawful notice, demand, or declaration of default under the FNMA promissory note or loan document is transmitted by or on behalf of FNMA—if the subject of such notice, demand, or declaration is something other than alleged (i) non-payment of installments of principal and

interest, (ii) failure to maintain adequate insurance, or (iii) failure to pay or properly set aside funds for ad valorem taxes -- then the DIP Lender, Debtor, Mark Breen, as depositor of the funds contained in the Breen Account, and FNMA shall have the right to a hearing before the Bankruptcy Court (hereinafter referred to as a "Contested Default Hearing"). FNMA, the DIP Lender, Mark Breen, as depositor of the funds contained in the Breen Account, and the Debtor shall be entitled to at least 14 days' notice of the Contested Default Hearing. In the event that a Contested Default Hearing has been requested in a writing filed with the Bankruptcy Court, then any further attempt by FNMA or any party on its behalf to exercise its rights triggered by such alleged default(s) shall be stayed until the Bankruptcy Court has entered a Final Order disposing of the dispute after presiding over the Contested Default Hearing. For the avoidance of doubt, the occurrence of a Breen Default shall not trigger the foregoing Contested Default Hearing procedure.

Provided that the Debtor complies in full with the terms of the Plan, including the completion of the Plan Repairs, such performance by the Debtor from and after the Effective Date shall constitute a full and complete cure of any and all defaults alleged to have arisen under the Loan Documents prior to the Filing Date as a result of any filed mechanic's lien or uncompleted Plan Repair. Notwithstanding the foregoing and notwithstanding anything to the contrary in this Plan or the Confirmation Order, all other rights of FNMA under the Loan Documents are otherwise preserved except to the extent expressly modified by the Plan or Confirmation Order, and nothing contained in the Plan or Confirmation Order shall be construed to prohibit FNMA from declaring a default or otherwise exercising remedies in accordance with the Loan Documents based on any other act or omission of the Reorganized Debtor or other defect in the condition of the Property

(Docket No. 264, Case No. 15-80319-G3-11).[50]

---

[50]The plan defines Plan Repairs as those identified in "Table 1 Safety Hazard and Immediate Repairs Costing" of the August PNA.

J.   Post-Confirmation Operations

Johnson testified that, after the plan was confirmed, the property was repaired.  (Tr. 12/7/2016, at p. 36).  Breen testified that the repairs completed included the parking lot repaving and striping, the driveway, the sidewalks, the gutters, and additionally, on Debtor's initiative, the pouring of extended concrete pads around the four large trash receptacles at the complex.  (Tr. 12/12/2016, at p. 75-77).  He testified that the cost of the repairs, including the additional pouring of the concrete pads, was approximately $160,000 to $170,000.  (Tr. 12/12/2016, at p. 78).

K.   The Pleadings in the Instant Adversary Proceeding

1.   Debtor's Complaint

Debtor's live affirmative pleading in the instant adversary proceeding is the "Second Amended Complaint of Windmill Run Associates, Ltd. Against Defendant Federal National Mortgage Association and Defendant Oak Grove Commercial Mortgage for Avoidance and Recovery under 11 U.S.C. §§ 547 and 550, for Declaratory Judgment, and for Breach of Contract, and Objections to Proof of Claim" (Docket No. 73, Adv. No. 15-8013).[51]

---

[51]A previous iteration of the complaint also contained a claim to avoid Fannie Mae's lien under Section 544 of the Bankruptcy Code, and a related claim for a declaratory judgment determining Fannie Mae to be unsecured.  The court previously granted summary judgment in favor of Fannie Mae on that claim. (Docket Nos. 52, 53, Adv. No. 15-8013).

Debtor's first claim for relief in the instant adversary proceeding seeks avoidance of an alleged preference pursuant to Section 547 of the Bankruptcy Code.  Debtor asserts that Fannie Mae and Oak Grove preferentially transferred to themselves in excess of $89,000 held in reserve accounts.

Debtor's second claim for relief in the instant adversary proceeding is for recovery of the alleged preference, pursuant to Section 550 of the Bankruptcy Code.

Debtor's third claim for relief in the instant adversary proceeding is for breach of contract.  Debtor asserts four separate breaches of contract.

Debtor asserts first that Fannie Mae's order for the March 23, 2015 PNA, the April 15, 2015 demand for deposit of $317,900, the July 24, 2015 demand letter, and the August 10, 2015 notice of acceleration and notice of foreclosure sale breached the note, the deed of trust, and the RRSA, because Fannie Mae had no right to take these actions under the loan documents, and that they were unreasonable in light of the actual cost of repairs.  Debtor asserts that it incurred "out of pocket, actual, expectancy, and consequential damages."

Debtor asserts second that Fannie Mae breached the provision in the deed of trust allowing 30 days' notice and an opportunity to cure, by demanding, in the April 15, 2015 letter, that Debtor deposit funds by May 1, 2015.  Debtor asserts that it

incurred as damages $89,000 swept from tax and insurance reserved funds, the cost of insurance premium financing, the pre-payment premium stated in Fannie Mae's proof of claim, the attorney fees incurred to file bankruptcy, and the attorney fees and costs associated with bringing the instant adversary proceeding. Debtor again asserts that it incurred "out of pocket, actual, expectancy, and consequential damages."

Debtor asserts third that Fannie Mae and Oak Grove breached the deed of trust, by failing to give notice to NAPICO of the April 15, 2015 letter, the July 24, 2015 letter, and the August 10, 2015 notice of acceleration and notice of foreclosure sale. Debtor again asserts that it incurred damages, including $89,000 swept from tax and insurance reserved funds, the cost of insurance premium financing, the pre-payment premium, the attorney fees incurred to file bankruptcy, and the attorney fees and costs associated with bringing the instant adversary proceeding. Debtor again asserts that it incurred "out of pocket, actual, expectancy, and consequential damages."

Debtor asserts fourth that Defendants breached the loan documents by sweeping $89,000 from reserve accounts at a time when Debtor alleges it was not in default. Debtor again alleges damages from this alleged breach including $89,000 swept from tax and insurance reserved funds, the cost of insurance premium financing, the pre-payment premium, the attorney fees incurred to

file bankruptcy, and the attorney fees and costs associated with
bringing the instant adversary proceeding.  Debtor again asserts
that it incurred "out of pocket, actual, expectancy, and
consequential damages."

Debtor's fourth claim for relief seeks a declaratory
judgment determining that the amount of Fannie Mae's claim is no
more than $1,530,364.70, less any damages and attorney fees
awarded to Debtor.

Debtor's fifth claim for relief objects to the claim of
Fannie Mae, on four separate grounds.

Debtor first asserts that Debtor is entitled to an
offset of the damages asserted elsewhere in the complaint,
against Fannie Mae's proof of claim.

Debtor second asserts that the claim should be denied
in its entirety, because FNMA has not filed an assumed name
certificate for the name Fannie Mae in Texas, and thus lacks
standing to assert the claim.

Debtor third asserts that the claim should be
disallowed in its entirety, because Defendants are the recipients
of preferential transfers.

Debtor fourth asserts that the proof of claim contains
several items for which Debtor is not liable, including the pre-
payment premium, default interest, legal fees, appraisal fee,
broker's opinion of value fee, Phase I environmental fee, and a

PNA fee.

Debtor's sixth claim for relief seeks an award of attorney fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 38.001, 37.009; 11 U.S.C. § 105; and Tex. Bus. & Comm. Code, Chapter 71 et seq., and also seeks an award of fees and costs attributable to responding to the motion for relief from stay.[52]

    2.  <u>Defendants' Answer and Fannie Mae's Counterclaim</u>

Defendants' live pleading is the "Defendants' Answer to Plaintiff's Second Amended Complaint and Counterclaims Against Plaintiff Windmill Run Associates, Ltd." (Docket No. 75, Adv. No. 05-8013).

In their answer, Defendants deny the material allegations of Debtor's complaint. Defendants also allege the following as affirmative defenses: failure to state a claim upon which relief may be granted; failure of conditions precedent; prior material breach of the loan documents; first to breach the loan documents; absence of Debtor's entitlement to attorney's fees under the deed of trust; absence of damages; failure to mitigate; Debtor was not compelled to seek bankruptcy protection; failure of presentment; absence of insolvency; NAPICO's interest in Windmill was extinguished, thereby making any notice to NAPICO

---

[52]Although not stated as such, the implication is that Debtor seeks allowance of fees and costs regarding the motion for relief from stay as a sanction for what Debtor perceives to have been improper filing and prosecution of the motion.

under the DOT unnecessary; and Fannie Mae is exempt from state
registration regulations.   (Docket No. 75, Adv. No. 15-8013).

      Fannie Mae also states two counterclaims against
Debtor.  Fannie Mae's first claim for relief in its counterclaims
is for breach of contract.  Fannie Mae asserts that Debtor
breached the deed of trust by failing to comply with the demand
contained in the April 15, 2015 letter to deposit $317,900, and
by failing to comply with the demand contained in the July 24,
2015 letter to deposit 317,900.  Fannie Mae also asserts that
Debtor breached the deed of trust by reason of a cross-default
under the LURA by failing to address property condition
deficiencies noted by TDHCA in its November 20, 2013 inspection.
Fannie Mae also asserts that Debtor breached the deed of trust by
allowing eight lien affidavits to be filed against the property,
and by scheduling three other claims secured by the property.[53]

      Fannie Mae's second claim for relief in its
counterclaims is for attorney fees.  Fannie Mae asserts that it
is entitled to recover its attorney fees based on the defaults it
asserts Debtor committed under the loan documents.

      3.  <u>Windmill's Answer to Fannie Mae's Counterclaims</u>

      Windmill's live defensive pleading in the instant
adversary proceeding is the "Answer of Windmill Run Associates,

---

     [53]Fannie Mae presented no evidence as to this last asserted
breach.  The relief requested regarding lien affidavits is
denied.

Ltd. To Counterclaims of Federal National Mortgage Association at Docket No. 75" (Docket No. 78, Adv. No. 15-8013).

In its answer, Debtor denies the material allegations of Fannie Mae's counterclaims. Debtor also alleges the following as affirmative defenses: Failure to include the counterclaims in Fannie Mae's proof of claim prior to the proof of claim deadline; offset; fees for the motion for stay relief were not reasonable; estoppel; motion for stay relief not authorized under Fannie Mae's guidelines; unclean hands; waiver; Oak Grove's lack of standing; Fannie Mae's lack of standing; Oak Grove's fees are prohibited under Fannie Mae's servicing guidelines; the fees sought exceed the maximum allowable under Fannie Mae's guidelines; failure of condition precedent; discharge; plan injunction; res judicata; ambiguity; statute of frauds; limitations; and laches. In its answer to Fannie Mae's counterclaims, Debtor again pleads for an award of attorney fees and costs, again citing Tex. Civ. Prac. & Rem. Code §§ 38.001, 37.009; 11 U.S.C. § 105; and Tex. Bus. & Comm. Code, Chapter 71 et seq.

     L.   <u>Postpetition Matters</u>

         1.   <u>The 506(b) Motion</u>

In the instant 506(b) motion, Fannie Mae seeks allowance of $646,825.42 in charges it asserts were incurred after the date of filing of the bankruptcy petition. It asserts

87

that the charges are composed of $520,379.91 in legal fees and expenses; $33,064.59 in expert witness fees; $10,784.87 in miscellaneous fees; and $82,596.05 in net postpetition interest.

Fannie Mae asserts that the $520,379.91 component for legal fees and expenses is comprised of $375,412.00 in fees and $5,771.39 in expenses billed by Bryan Cave, as attorneys for Fannie Mae, and $137,166.50 in fees and $2,030.02 in expenses billed by KCW, as attorneys for Oak Grove.

Fannie Mae asserts that the $375,412.00[54] in fees billed by Bryan Cave is comprised of $62,713.90, representing 171.7 hours spent working on the motion for relief from stay; $27,485.20, representing 72.6 hours spent on the DIP financing motion; $143,086.40, representing 333.7 hours spent on the plan and disclosure statement; $64,993.40, representing 143.4 hours spent on the instant adversary proceeding; $27,984.60, representing 77.3 hours spent on case administration; $17,349.70 representing 30.5 hours spent on fee and employment applications; $16,052.90, representing 39.1 hours spent on non-working travel; and $15,745.90, representing 45.4 hours spent on real estate matters.

Fannie Mae asserts that the $137,166.50 in fees billed by KCW is comprised of $4,226.50, representing 10.7 hours spent working on the motion for relief from stay; $2,567.50,

---

[54]This amount includes $15,181.70 billed prepetition.

representing 6.5 hours spent on the DIP financing motion;
$65,518.00, representing 171.2 hours spent on the plan and
disclosure statement; $56,723, representing 163.7 hours spent on
the instant adversary proceeding; $7,815.50, representing 21.8
hours spent on case administration; and $7,815.50, representing
21.8 hours spent on fee and employment applications.

Fannie Mae asserts that the $33,064.59 in expert
witness fees is comprised of two fees, in the amounts of
$12,316.59 and $12,250.00, billed by Sam Heigle, $7,498.00 billed
by Chris Kling, and a $1,000 broker's price opinion.[55]

Fannie Mae asserts that the $10,784.87 miscellaneous
fee category is comprised of a $2,400 PNA fee, and $8,384.87 in
late charges.

Fannie Mae asserts that the $82,596.05 interest item is
comprised of $105,725.33 at the non-default rate, plus $62,270.72
in interest at the default rate, less $87,400.00 in payments
made.

2.   Debtor's Objection to the 506(b) Motion

Debtor filed an objection to the instant 506(b) motion
on October 7, 2016.  (Docket No. 280, Case No. 15-80319-G3-11).

Debtor's objections generally can be grouped into
several categories:  Debtor objects to the allowance of any fees

---

[55]This appears to be separate from the July 21, 2015
broker's price opinion.

with respect to the motion for relief from stay, on grounds the
motion was unjustified; Debtor objects to the allowance of fees
of Bryan Cave in the instant adversary proceeding at a time when
Fannie Mae was represented by other counsel; Debtor objects to
the allowance of some fees on grounds the time spent was
unreasonable; Debtor objects to lumping and vague or duplicative
time entries; the fees are out of proportion to the needs of the
case; Oak Grove is not entitled to a relief under Section 506(b)
of the Bankruptcy Code; the fees are barred by Fannie Mae's
material breaches of contract; the deed is avoidable and Fannie
Mae is unsecured.[56]

      M.   <u>Testimony as to the 506(b) Motion</u>

          1.  <u>Keith Aurzada, of Bryan Cave</u>

      Aurzada testified that he is one of two primary
partners at Bryan Cave responsible for managing the relationship
with Fannie Mae.  (Tr. 12/15/2016, at. p. 137).  He testified
that his firm submits bills to Fannie Mae through a system called
CounselLink.  (Tr. 12/15/2016, at p. 142).  He testified that he
receives a pro forma printout of the firm's time entries on a
monthly basis.  (Tr. 12/15/2016, at p. 154).  He testified that
the information from the pro forma, with his changes, results in
electronic invoices that are transmitted to Fannie Mae.  (Tr.

---

      [56]The court notes that this last is the same argument that
was resolved in favor of Fannie Mae on summary judgment in the
instant adversary proceeding.  <u>See</u> Section K. 1., above.

12/15/2016, at p. 157-158). He testified that he believes that when Bryan Cave transmits a request for payment to a client electronically via CounselLink, the transmittal is made from the original time entries recorded by the timekeepers at Bryan Cave. (Tr. 12/16/2016, at p. 45). He did not do the transmittal, nor does he have a full grasp of how the transmittal is prepared or what the transmittal looks like. (Tr. 12/16/2016, at p. 21-26).

Aurzada testified that the typed time records, which were attached to the 506(b) motion, accurately reflect the work done, and hourly rates charged, by Bryan Cave personnel in the instant case. (Tr. 12/16/2016, at p. 63).[57]

Aurzada testified that Bryan Cave consulted with Fannie Mae, and reviewed the testimony of third parties and reports, as to the condition of the property, and also what Fannie Mae perceived as a lack of value, in determining to file the motion for relief from stay. (Tr. 12/19/2016, at p. 19).

Aurzada testified that Bryan Cave represented Fannie Mae in defending itself in the instant adversary proceeding. He

---

[57]The court notes that the document prepared for trial, Defendants Exhibit 67, was not admitted into evidence. The evidence actually admitted (the court's judicial notice of the motion at Docket No. 276 and its attachments) reflects what Bryan Cave believes it billed, but does not reflect the actual invoices submitted to Fannie Mae. It appears the actual invoices were electronic, in a process not familiar to Aurzada, and were not available. Nonetheless, Aurzada testified that Bryan Cave was paid for the work reflected in the time records. (Tr. 12/19/2016, at p. 134).

91

testified that Bryan Cave represented Fannie Mae in opposing confirmation of Debtor's plan, and in preparing for a contested confirmation hearing. He testified that Fannie Mae's continual objection addressed the repairing of the property. (Tr. 12/19/2016, at p. 29-30).

Aurzada testified that the fee requested is reasonable. He explained, in part:

> Fannie Mae is a quasi-governmental agency. They have thousands of loans across the country. They have to treat them all similarly, and when borrowers challenge the debt, try to put priming liens on the secured creditor, contest confirmation and refuse to repair properties they have to take that seriously.

(Tr. 12/19/2016, at p. 31).

Aurzada testified that the instant adversary proceeding included a cause of action to invalidate Fannie Mae's lien.[58] He testified that he believed that cause of action to be "an absolute all out act of war." (Tr. 12/19/2016, at p. 22-23).

Aurzada testified that he viewed the DIP financing motion as an attempt by an insider of the Debtor to gain leverage in the bankruptcy case. (Tr. 12/19/2016, at p. 23).

2.   Brian Kilmer, of KCW

Kilmer testified that he was first contacted by Johnson to represent Oak Grove in the instant Chapter 11 case with

---

[58]The court notes that this is the same argument that was resolved in favor of Fannie Mae on summary judgment in the instant adversary proceeding. See Section K. 1., above.

respect to a subpoena for documents Johnson received from Debtor
in October, 2015.  He testified that he did not make an
appearance in the Chapter 11 case at that time, because his role
was limited to getting the documents together in responding to
the subpoena.  (Tr. 12/21/2016, at p. 48).

Kilmer testified that he received a copy of the
complaint in the instant adversary proceeding shortly after it
was filed.  (Tr. 12/21/2016, at p. 48).  He testified that he
began to monitor events in the Chapter 11 case when he perceived
that issues raised with respect to Fannie Mae's motion for relief
from stay overlapped with issues raised in the instant adversary
proceeding.  (Tr. 12/21/2016, at p. 51-52).

Kilmer testified that he reviewed the various
iterations of the disclosure statement and plan.  (Tr.
12/21/2016, at p. 54).  He testified that he attended the
hearings on the motion for relief from stay, disclosure
statement, and confirmation.  (Tr. 12/21/2016, at p. 55).  He
testified that he viewed it as prudent to attend the hearing on
the motion for relief from stay in order to see whether it was
necessary to take an action on behalf of Oak Grove.  (Tr.
12/21/2016, at p. 58).

Kilmer testified that Oak Grove retained a right to
enforce the loan documents on its own behalf.  (Tr. 12/21/2016,
at p. 94).  That testimony depends on the incorrect assertion

93

that Midland Mortgage retained some sort of right after assigning
all its rights under the loan documents to Fannie Mae.
(Defendants Exhibit 4).  It is not credible.

    N.   Credibility of Witnesses

       The testimony of James Noakes was inconsistent.  His
testimony was somewhat credible, but, as to the matters most
probative regarding the instant issues, is accorded lesser weight
than that of some of the other witnesses.

       The testimony of Frank Fonseca was highly credible and
competent.  The court accords it great weight.

       The testimony of Bill Johnson was generally self-
serving, and frequently evasive, and is accorded lesser weight.

       The testimony of Michael Biederstadt[59] was generally
credible and competent.  However, it was not particularly
probative as to the instant matters.

       The testimony of Brenna Hayes, the apartment manager,
was highly credible and competent.  The court accords it great
weight.

       The expert testimony of Bruce Ruzinsky was credible and
competent.

       The testimony of Mark Breen was highly credible and
competent.  The court accords it great weight.

---

    [59]Biederstadt testified as an expert regarding repair costs.
The court finds most probative the testimony of Breen as to what
the repairs ultimately did cost.

94

The testimony of Kevin Gerstbrein and Samantha Ray[60] was credible and competent.

The testimony of Keith Aurzada was credible as to his own activities, both as lead counsel and as the managing attorney for Bryan Cave's representation of Fannie Mae.  The remainder of his testimony demonstrates a lack of familiarity with the underlying facts, and is accorded little weight.

The testimony of Tim Cole was credible and competent.

The testimony of Brian Kilmer was credible and competent as to the activities of KCW.  It was not credible as to Oak Grove's asserted right to enforce the loan documents on its own behalf, after its predecessor in interest, Midland Mortgage, assigned all its rights under the loan documents to Fannie Mae.

The testimony of Annie Catmull[61] was credible and competent.

### Conclusions of Law

A.   Jurisdiction and Authority to Enter Final Orders

The bankruptcy court has jurisdiction pursuant to 28 U.S.C. § 1334(b), as to the claims for avoidance and recovery of preference, and objecting to claim in the instant adversary proceeding, as well as the instant 506(b) motion, as matters

---

[60]Gerstbrein and Ray were called to authenticate various documents.

[61]Catmull was Debtor's counsel.  She testified primarily regarding Fannie Mae guidelines for servicers.

95

which arise under the Bankruptcy Code.   The court has jurisdiction as to the remaining causes of action asserted in the instant adversary proceeding pursuant to 28 U.S.C. § 1334(b) as matters related to the bankruptcy case.

The court has constitutional authority to enter final orders, both because resolution of the claims and causes of action stated in the instant adversary proceeding and the instant 506(b) motion are necessarily resolved in the claims allowance process, see Stern v. Marshall, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), and because the parties have consented to the entry of final orders in the bankruptcy court, see Executive Benefits Ins. Agency v. Arkison, --- U.S. ----, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014).

B.    Preference

Section 547(b) of the Bankruptcy Code provides:

(b) Except as provided in subsections (c) and (I) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of
> this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such
> debt to the extent provided by the provisions
> of this title.

11 U.S.C. § 547(b).

Debtor has the burden of proof with respect to the establishment of the elements of a preference under Section 547(b).  See In re Flanagan, 503 F.3d 171 (2d Cir. 2007).  In the instant case, Debtor did not present evidence on the questions of Debtor's solvency, whether a transfer occurred, and whether such transfer enabled Fannie Mae to receive more than it would have received in a case under Chapter 7.  The court concludes that Debtor has failed to meet its burden of proof for avoidance and recovery of an alleged preferential transfer.  As a result, the portion of Debtor's objection to Fannie Mae's claim addressing Defendants' alleged receipt of a preferential transfer must be denied.

C.  Standing

Under the Fannie Mae Charter Act, Fannie Mae has the power to conduct its business "without regard to any qualification or similar statute in any State of the United States." 12 U.S.C. § 1723a(a).  The court concludes that this statute enables Fannie Mae to prosecute the above captioned case and adversary proceeding, without the filing of an assumed name certificate.

97

D.    Breach of Contract

Under Texas law, the elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance; (3) breach of the contract; and (4) damages sustained as a result of the breach.  Crose v. Humana Ins. Co., 823 F.3d 344 (5th Cir. 2016).

1.    Valid Contract

In the February PNL, the parties agreed that the loan documents, including, inter alia, the note, deed of trust, and RRSA, were valid.  The court concludes that there was a valid contract.

When a contract incorporates by reference a provision from another document, that provision becomes a part of the contract into which it was incorporated and is thus construed with the contract.  PER Group, L.P. v. Dava Oncology, L.P., 294 S.W.3d 378 (Tex. App.--Dallas 2009).  Separate documents executed at the same time, for the same purpose, and in the course of the same transaction are to be construed together.  Jones v. Kelley, 614 S.W.2d 95 (Tex. 1981).

The note, the deed of trust, and the RRSA were executed contemporaneously.  The court concludes that these documents form the contract between the parties.

2.   <u>Performance or Tendered Performance</u>

There is no dispute that Debtor performed its obligation under the contract to make all payments of principal and interest.  The testimony of Fonseca and Breen that Breen offered to deposit funds to make repairs to the property, beginning no later than January 20, 2015, is credible and persuasive.  The court concludes that Debtor performed or tendered performance of the contract.[62]

3.   <u>Breach</u>

A party breaches a contract by failing to perform when that party's performance is due.  <u>Hoss v. Alardin</u>, 338 S.W.3d 635 (Tex. App.--Dallas 2011).  A party to a contract who is in default cannot maintain a suit for its breach.  <u>Dobbins v. Redden</u>, 785 S.W.2d 377 (Tex. 1990).

Under the doctrine of substantial performance, exactitude in the performance of contractual duties may not be required where any deviations or deficiencies do not seriously impair the purpose underlying the contractual provision.  <u>South Tex. Elec. Coop. v. Dresser-Rand Co.</u>, 575 F3d 504 (5th Cir. 2009).  However, if a party has committed a material breach, its performance cannot be "substantial."  <u>Balfour Beatty Rail, Inc. v. Kansas City Southern Ry. Co.</u>, 173 F. Supp. 363 (N.D. Tex.

---

[62]The court additionally notes that Fannie Mae's predecessor, Midland Mortgage, performed its initial duty under the note of advancing the funds borrowed pursuant to the note.

2016), citing Patel v. Ambassador Drycleaning Co., 86 S.W.3d 304 (Tex. App.--Eastland 2002).

In determining whether a breach is material, Texas courts consider (a) the extent to which the injured party will be deprived of the benefit he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Matter of Dallas Roadster, Ltd., 2017 WL 187705 (5th Cir. 2017), citing Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195 (Tex. 2004).

If the language used in a contract is susceptible of two constructions, that interpretation will be adopted that renders the contract fair and reasonable, rather than a construction that is unreasonable, inequitable, oppressive, or that would yield an absurd result. Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310 (Tex. 2005); Lane v. Travelers Indem. Co., 391 S.W.2d 399 (Tex. 1965).

When one party prevents another from timely performing its contractual obligations, the failure to timely perform is excused. SP Terrace, L.P. v. Meritage Homes of Texas, LLC, 334 S.W.3d 275 (Tex. App.--Houston [1st Dist.] 2010).

When a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice. Emerald Forest Utility Dist. v. Simonsen Const. Co., Inc., 679 S.W.2d 51 (Tex. App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.).[63]

When one party to an agreement has repudiated it, the other party may then accept the agreement as being terminated or consider the repudiation as a breach of contract and bring suit for damages. Hauglum v. Durst, 769 S.W.2d 646 (Tex. App.--Corpus Christi 1989). A repudiation must be a distinct, positive, unequivocal, and absolute refusal to perform the contract in the future. Davis v. Canyon Creek Estates Homeowners Ass'n, 350 S.W.3d 301 (Tex. App.--San Antonio 2011).

---

[63]In its brief, Fannie Mae cites Villarreal v. Wells Fargo Bank, N.A., 814 F.3d 763 (5th Cir. 2016), noting, inter alia, that the court properly dismissed a claim by a plaintiff based on notice at an allegedly improper address. That opinion is inapposite to the instant case because the court's holding was that the plaintiff failed to plead her own performance. The court did not hold that notice at an allegedly improper address would not have been a breach of contract.

An anticipatory breach or repudiation has been committed when one party to the contract demands of the other a performance to which he has no right under the contract and states definitely that unless his demand is complied with he will not render his promised performance.  Humphrey v. Placid Oil Co., 142 F. Supp. 246 (E.D. Tex. 1956).

In the instant adversary proceeding, each side has asserted that the other breached the contract.  Thus the questions presented are which side, if any, breached the contract first; and whether any such breach was material.  If such a breach occurred, and was material, it would excuse the other side's nonperformance.  However, as set forth below, the court finds that both sides were in breach, such that neither may recover damages for breach of contract.

The event first in time to be alleged to be a breach of the contract is Defendants' allegation that the conveyance during 2012 to Breen of the limited partnership interest in the Debtor breached the deed of trust.  Section 21 of the deed of trust expressly excludes from those transfers which constitute a default, the transfer of a limited partnership interest.  The court concludes that Debtor did not breach the contract through the conveyance of a limited partnership interest to Breen.

The event next-in-time to be alleged to be a breach of the contract is Defendant's allegation that Debtor failed to

102

maintain the property, beginning in 2012.  Section 17(a) of the
deed of trust required the Debtor to keep the property in good
repair, and to restore or repair promptly any damaged part of the
property to the equivalent of its original condition, or such
other condition as the Lender may approve in writing.  It would
be an absurd construction of the Debtor's obligation to keep the
property in good repair to determine that any time the property
developed damage, such as a single crack in a sidewalk or parking
lot, the debtor was in breach of the deed of trust.  It would be
an absurd construction of the Debtor's obligation to restore or
repair any damaged part to "such other condition as the Lender
may approve in writing," to determine that that provision
authorized Defendants to demand a prompt improvement of a damaged
part to a condition which was substantially better than the
original condition of the property.

        The evidence before the court reflects that, although
there had been discussion of the condition of the property, the
first time it was raised as an issue needing prompt attention was
the February 26, 2013 email from Johnson to Debtor stating that
there would be no further disbursements from the Replacement
Reserve account until "we can satisfactorily resolve the
outstanding deferred maintenance issues" contained in the 2012
PNA.  Thereafter, the parties continued negotiating over the
scope of the repairs.  There is nothing in the evidence

purporting to state that Defendants considered Debtor to have
breached the contract prior to the April 15, 2015 letter from
Johnson.

Additionally, during the period from February 26, 2013
through April 15, 2015, Oak Grove inhibited Debtor from
completing repairs, by continuing to insist that the repairs
include the replacement of the asphalt parking lot and sidewalks
with concrete (a replacement of a quality far better than the
original asphalt), and by refusing to reach agreement on the
scope of repairs, or available coverage from the Replacement
Reserve.  The court concludes that Debtor did not breach the
contract prior to April 15, 2015.

In the April 15, 2015 letter, Oak Grove asserted for
the first time a default under the loan documents.  Oak Grove
continued to insist on concrete paving, and various repairs, and
demanded a deposit of $317,900 without assuring that the
deposited funds would be used for the repairs on the property as
contemplated in the March, 2015 "PNA" (this was the PCA not
authorized by the loan documents).  The notice given under the
April 15, 2015 letter was given pursuant to the deed of trust,
but the notice did not comply with the deed of trust's
requirement of notice to NAPICO.  The provision for notice to
NAPICO was an important feature of the deed of trust, because the
investors in NCTC Fund X, which was administered by NAPICO, had a

104

potential tax recapture liability which likely would have been triggered by a foreclosure.  The court concludes that notice to NAPICO was a condition precedent to the invocation of rights under the deed of trust.  The court concludes that Fannie Mae and Oak Grove did not give effective notice to Debtor by virtue of the April 15, 2015 letter.

Although Debtor was never in default on principal and interest, and no default was created by Oak Grove's sending of the April 15, 2015 letter, the sending of the April 15, 2015 letter was a breach of the deed of trust by Oak Grove on behalf of Fannie Mae only if it was a repudiation of the contract.  In the April 15, 2015 letter, Oak Grove demanded a deposit of $317,900, pursuant to the RRSA.  Oak Grove had a right to demand a deposit of funds, under the RRSA, for Additional Replacements, which were defined as replacements advisable to keep the property in good order and repair and in a good marketable condition, or to prevent deterioration of the property.  In the April 15, 2015 letter, Oak Grove purports to notify Debtor that the repairs called for in the March, 2015 "PNA" (not called for under the loan documents) are Additional Replacements, for which a deposit was necessary.  The court believes this assertion was not done correctly.  However, the assertion of such a right, whether done correctly or not, was not in itself an unequivocal repudiation of the contract.  See Holmes v. Jetall Companies, Inc., 2016 WL

105

3662645 (Tex. App.--Houston [1st Dist.] 2016) (threat to withhold a portion of the money owed until disputes were resolved was held not to be an anticipatory repudiation).

In the July 24, 2015 demand letter and notice of intent to accelerate, Fannie Mae asserted a default under the note.[64] However, the provision which Fannie Mae asserts was breached is not contained in the note.  The provision which Fannie Mae asserts was breached is contained in the RRSA.  The RRSA provides that notices under it must be given in the manner set forth in the security instrument (i.e. the deed of trust).  The deed of trust required notice to NAPICO.  The court concludes that Fannie Mae did not give effective notice of default to Debtor, by virtue of the July 24, 2015 demand letter.

Likewise, the July 24, 2015 demand letter and notice of intent to accelerate is not an unequivocal repudiation of the contract on the part of Fannie Mae.

The situation changed with the August 10, 2015 notice of acceleration and posting for foreclosure.  At this point Fannie Mae took an action that was an unequivocal act that rendered impossible Debtor's continued performance under the contract, in declaring the debt accelerated and seeking foreclosure.  That action was the true "act of war" among the

---

[64]This is unlike the April 15, 2015 letter, in which Oak Grove asserted a default under the deed of trust.

parties.  Fannie Mae's action of posting for foreclosure repudiated the contract, because it sought to terminate Debtor's right to retain possession of the property and maintain payments. In addition, Fannie Mae's failure to provide notice to NAPICO was a material breach, potentially occasioning tax recapture liability against NAPICO's investors, that precludes Fannie Mae's recovery for Debtor's alleged breach of contract, even if the need for repairs had reached a critical point.[65]

However, Debtor could maintain suit for breach of contract only if it was not itself in default.  Dobbins v. Redden, 785 S.W.2d 377 (Tex. 1990).

The question of whether Debtor was in default of its obligations under the contract on August 10, 2015 is a complex question, about which there was extensive testimony at trial. Debtor's pertinent obligations were 1) to keep the property in good repair, and to restore or repair damage; and 2) to deposit funds for Additional Replacements.  These obligations were part of an integrated contract, such that the obligation to deposit funds for Additional Replacements was designed to make funds available to keep the property in good repair, and to restore or repair damage.  A fair and reasonable interpretation of the

---

[65]In making this determination, the court finds persuasive the absence of an opportunity to cure, the potential deprivation of the tax benefit for NAPICO's investors, and the bad faith of Fannie Mae and Oak Grove in their demands.

contract provisions, read together, is that they required Debtor
to deposit funds sufficient make the repairs that were necessary
to keep the property in good repair, and to restore the property
to its original condition.  The demands of Fannie Mae, through
Oak Grove, were predicated on repairs that were in excess of
those necessary to keep the property in good repair, and to
restore the property to its original condition, and through Oak
Grove, there was no assurance that money deposited would be used
on those repairs.[66]  However, the contract gave them this right,
since there is no requirement under Texas law that such a demand
be made in good faith.  Central Savings & Loan Ass'n v. Stemmons
Northwest Bank, N.A., 848 S.W.2d 232 (Tex. App.--Dallas 1992).
 There were at least some repairs as to which there was no
dispute (including the resurfacing and restriping of the parking
lot, and roof gutter repairs), and on August 10, 2015, although
Fannie Mae had not given effective notice of default, Debtor was
in default of its requirement to deposit new funds in addition to
those in the Replacement Reserve, sufficient for those repairs.
Debtor's failure to deposit funds for repairs may be excused
prior to April 15, 2015, and perhaps as late as August 10, 2015,
due to negotiations among the parties.  However, on August 10,

---

[66]For example, Johnson's email of February 26, 2013,
discussed above at p. 27, stating that there would be no further
disbursements from the Replacement Reserve, and also Johnson's
email of December 11, 2014, discussed above at p. 31-32, stating
maximum disbursements for four years in advance.

2015, those negotiations ceased.  Debtor's failure to deposit funds for repairs which were not in dispute continued.  The court concludes that Debtor is precluded from recovery for breach of contract.

    4.  <u>Damages</u>

      The court's conclusion that both sides are precluded from recovering for breach of contract means that the court's analysis of damages is moot.  However, because one or both sides may appeal this court's ruling, the court addresses the questions of law and fact presented as to damages.

    a.  <u>To the Extent of Defendants' Breach</u>

      Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract.  Accordingly, contract damages serve to give a plaintiff the benefit of his bargain, i.e., to place the plaintiff in the position he would have occupied if the contract had been performed.  <u>Hoffman v. L&M Arts</u>, 838 F.3d 568 (5th Cir. 2016), <u>citing</u> <u>Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Tex.), L.P.</u>, 447 S.W.3d 474 (Tex. 2014).

      In a breach of contract action, damages may be broken into one of two categories: actual (direct) damages or consequential damages.  Actual damages may be recovered when the loss is the natural, probable, and foreseeable consequence of the

defendant's conduct.  Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong.  Consequential damages are recoverable if the damages were foreseeable by the parties, directly traced to the breach, and result from the breach.  In re H&M Oil & Gas, LLC, 514 B.R. 790 (Bankr. N.D. Tex. 2014) citing Mead v. Johnson Group, Inc., 615 S.W.2d 685 (Tex. 1981) and Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812 (Tex. 1997).  Under Texas law, "reasonable" attorney's fees are recoverable for a successful breach of contract claim.  Tex. Civ. Prac. & Rem. Code § 38.001(8).

To the extent Defendants breached the contract, Debtor asserts that the damages include the incurrence of a prepayment premium in the amount of $208,000; the $388,830.22 in fees and costs allowed to Debtor's counsel in the bankruptcy case; $150,000 in travel costs for Fonseca and Breen to appear at multiple hearings and meetings with counsel; $5,200 for Biederstadt's property report; $35,000 to $50,000 in legal fees advanced by National Mortgage Investors; insurance premium charges incurred by Debtor; and $50,000 paid by Fonseca to his counsel for defending the suit brought against him by Fannie Mae. (Docket No. 178, Adv. No. 15-8013).

As to the elements of damage asserted on behalf of third parties, they are not parties to the above captioned

110

adversary proceeding.  Those categories of asserted damages would not be recoverable by <u>Debtor</u> in the above captioned adversary proceeding.  There is no evidence that Debtor paid for the travel costs of Fonseca and Breen, Biederstadt's property report, or Fonseca's counsel.

As to the insurance premium line item, Debtor incurred an additional insurance finance charge of $351.90 as a result of Fannie Mae's sweep of the escrow account for insurance.  The court concludes that, if Debtor were permitted to recover for Fannie Mae's breach of contract, the court would allow damages of $351.90 on this item.

As to the line item for legal fees advanced by National Mortgage Investors, that entity did not file a proof of claim, and no provision was made in the plan for repayment.  The court concludes that, if Debtor were permitted to recover for Fannie Mae's breach of contract, the allowable damages would not include the funds advanced prepetition by National Mortgage Investors for legal fees.

As to the line item for the legal fees for filing the bankruptcy case, the court has found no authority directly on point.  However, generally under Texas law, attorney's fees and litigation expenses may not be recovered unless provided for by statute or by contract between the parties.  But a plaintiff may recover attorney's fees and other reasonable expenses which were

111

incurred in litigation with a third party as damages when such damages are the natural and proximate consequence of the defendant's wrongful conduct, i.e., when those expenses represent consequential damages.  Consequential damages are those that result naturally, but not necessarily, from the defendant's wrongful acts.  Great Am. Ins. Co. v. AFS/IBEX Fin. Serv., Inc., 612 F.3d 800 (5th Cir. 2010).  The court concludes that, to the extent of a breach of contract by Defendants, the Debtor's legal fees for filing and maintaining the instant bankruptcy case resulted naturally from the breach, and thus would be allowable as consequential damages.

As to the prepayment premium, it exists as consequential damages for a breach of the contract by Defendants. The court concludes that, to the extent of a breach of contract by Defendants, the prepayment premium would be allowable to Debtor as consequential damages.

b.   To the Extent of Debtor's Breach

The only line item of damages asserted by Defendants is the reasonable fees and expenses Fannie Mae asserts it has incurred.  Fannie Mae asserts in its counterclaim that those fees and expenses include the "fees and expenses incurred by Fannie Mae, its servicers, attorneys, experts, and consultants."

The only evidence presented at trial was as to the fees and expenses sought by Defendants in the instant 506(b) motion.

112

No evidence was presented as to prepetition fees and expenses. The evidence presented as to fees and expenses is addressed below, in connection with the 506(b) motion.  To the extent of Debtor's breach, certain fees and expenses would be allowable pursuant to Tex Civ. Prac. & Rem. Code § 38.001(8).

E.   Declaratory Judgment

In the complaint, Debtor sought a declaratory judgment as to the amount of Fannie Mae's claim.  Although it appears that the request for declaratory judgment is somewhat intertwined with either the request to invalidate Fannie Mae's lien, as to which the court previously granted summary judgment to Fannie Mae, or to the claim objection, Debtor presented no evidence in support of a claim for declaratory judgment.  The court concludes that no declaratory judgment should issue.

F.   Claim Objection

Section 502(b)(1) of the Bankruptcy Code provides:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if...objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

As addressed in greater detail above, Debtor objects to Fannie Mae's proof of claim on four grounds:  offset; standing; preference; and items for which Debtor asserts it is not liable.

With respect to the questions of standing and preference, the court has previously determined that those arguments lack merit.

With respect to the question of offset, to the extent Debtor is entitled to damages, Debtor is entitled to an offset. However, as addressed above, Debtor is not entitled to an award of damages.

As to the question of items for which Debtor asserts it is not liable, a proof of claim is prima facie evidence of the validity and the amount of the claim.  Bankruptcy Rule 3001(f). The objector has the initial burden of presenting enough evidence to overcome the prima facie effect of the proof of claim.  If the objector successfully presents enough evidence to overcome the prima facie effect of the proof of claim, then the claimant must prove the validity of the claim.  In re O'Connor, 153 F.3d 258 (5th Cir. 1998).

The items as to which Debtor objects are the pre-payment premium, default interest, prepetition legal fees, an appraisal fee, a broker's opinion of value fee, a Phase I environmental fee, and a PNA fee.

As to the prepayment premium, the contract provides that the prepayment premium is due if, _inter alia_, the note is accelerated.  The note, by its own terms, provides that Debtor waived notice of acceleration.  Thus, the failure to notify NAPICO does not preclude the acceleration of the note.  The court concludes that the prepayment premium is part of Fannie Mae's claim.  However, Debtor is entitled to an offset of the claim as consequential damages to the extent of Fannie Mae's breach of contract.

As to prepetition legal fees and default interest, Fannie Mae's notices of default to Debtor were insufficient, both because Fannie Mae failed to notify NAPICO, and because Fannie Mae failed to allow 30 days' opportunity to cure before taking further action.  The court concludes that Fannie Mae is not entitled to prepetition legal fees and default interest.

As to the prepetition appraisal fee, broker's opinion of value fee, Phase I environmental fee, and PNA fee, Fannie Mae had the burden of proof following Debtor's substantial objection, and presented insufficient evidence to sustain its burden of proof.  Additionally, Fannie Mae's failure to give adequate notice of default and an opportunity to cure to Debtor and NAPICO precludes Fannie Mae's recovery on these line items.  The court concludes that these line items are not allowable as part of Fannie Mae's claim.

115

The court concludes that the allowed amount of Fannie Mae's prepetition claim is $1,738,763.34.[67]  This amount would be $1,530,364.70, reflecting the offset of the prepayment premium, in the amount of $208,398.64, if Debtor were allowed to recover for Fannie Mae's breach of contract.

G.  The 506(b) Motion

Section 506(b) of the Bankruptcy Code provides:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

The note required Debtor to pay Fannie Mae's reasonable expenses and costs in three instances:  as a result of any default; in connection with efforts to collect any amount due under the note; or to enforce the provisions of any of the other loan documents.

The agreement under which Fannie Mae's 506(b) claim is brought is the integrated contract, consisting of the note, deed of trust, and RRSA.  The court has determined that Fannie Mae is not entitled to assert damages for a breach of contract.

---

[67]This amount represents the principal of $1,602,317.02, plus prepetition interest of $8,493.17 at the contract rate, plus the $208,398.64 prepayment premium, less the credit of $80,445.49 for swept escrows.

However, the agreement does provide for all fees and costs incurred to enforce the provisions of the loan documents. The enforcement of the provisions of the loan documents encompasses, inter alia, the provisions of the RRSA addressing the property condition. Significantly, Section 506(b) imposes the additional requirement that such charges be reasonable.[68]

### 1.  Attorney Fees

Section 330(a)(3) of the Bankruptcy Code sets forth standards for consideration of the reasonableness of fees allowed to a professional of the estate in a bankruptcy case:

> [T]he court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

---

[68]The court notes that, in Matter of Dallas Roadster, Ltd., 2017 WL 187705 (5th Cir. 2017), the Fifth Circuit made an Erie guess as to how Texas courts would apply Zachry Construction Corp. v. Port of Houston Authority, 449 S.W.3d 98 (Tex. 2014), declining to extend Zachry to disallow recovery for attorney fees where the party seeking attorney fees successfully defended the debtor's counterclaims. The court distinguishes the instant case from Dallas Roadster in that Fannie Mae and Oak Grove did materially breach the loan agreements. And, notably, in the instant case, the question presented is whether the fees are reasonable, under Section 506(b).

> (E) with respect to a professional person, whether
> the person is board certified or otherwise has
> demonstrated skill and experience in the
> bankruptcy field; and
> (F) whether the compensation is reasonable based
> on the customary compensation charged by
> comparably skilled practitioners in cases other
> than cases under this title.

11 U.S.C. § 330(a)(3). With respect to estate professionals, the court determines whether the services were reasonably likely to benefit the estate at the time the service was rendered. The Fifth Circuit has described litigation services as a "gamble," and held that the court may compensate attorneys for services that were objectively reasonable at the time they were made, even when those gambles do not produce an identifiable, tangible, and material benefit. What matters is that, prospectively, the choice to pursue a course of action was reasonable. Matter of Woerner, 783 F.3d 266 (5th Cir. 2015). Although the Bankruptcy Code does not expressly provide that the factors set forth in Section 330 apply to a motion under Section 506(b), the court concludes that the considerations set forth in Section 330, including the rule set forth in Woerner, are relevant to the determination of whether fees incurred are reasonable under Section 506(b).

    a.   The Motion for Relief from Stay

In the instant 506(b) motion, Fannie Mae and Oak Grove assert that the Bryan Cave firm billed 171.7 hours, for a total fee of $62,713.90, with respect to the motion for relief from

118

stay.  Fannie Mae and Oak Grove assert that KCW billed 10.7 hours, for a total fee of $4,226.50, with respect to the motion for relief from stay.

The court has reviewed the Bryan Cave time records[69] attached to the instant 506(b) motion.  With respect to the motion for relief from stay, they can be grouped into the following categories:  preparation of the motion; communication with client, opposing counsel, and the court regarding scheduling; conducting and responding to discovery (including the raising and resolution of disputed discovery issues); preparation for hearings; communication with experts regarding value; communication with experts regarding other issues; strategy communications; preparing for trial; and attending trial.

The court finds that the time spent addressing the question of value, for the purpose of the motion for relief from stay, was not reasonable.  The time entries relating to the question of value include a portion of the time for preparation of the motion, discovery, strategy, preparation for hearings and trial, and attending trial, as well as all of the time addressing communications with, and disputes regarding, the appraiser.  The

---

[69]The typed records were offered by Fannie Mae as "invoices," and were not admitted.  They were not copies of the electronic invoices sent to Fannie Mae.  However, Aurzada testified that the records, which are at Defendants Exhibit 67, were attached to the 506(b) motion, and accurately reflect the work done by Bryan Cave personnel in the case.  (Tr. 12/16/2016, at p. 63).

court finds that the appropriate deduction to the time records of Bryan Cave, in light of the value issue, is $23,046.05.[70]

There is no evidence that any of the time spent by KCW with respect to Fannie Mae's motion for relief from stay was reasonable.  Kilmer testified that he attended the hearing "to understand a little bit more about what was being alleged in the litigation by Windmill Run and how it pertained to the adversary."  (Tr. 12/21/2016, at p. 52).  Kilmer asked no questions and made no argument at the hearing on the motion for relief from stay.  His participation appears entirely duplicative of the services provided by counsel for Fannie Mae.  The court concludes that the appropriate deduction related to the time records of KCW, with respect to the motion for relief from stay, is $4,226.50.[71]

---

[70]As set forth below, there are additional deductions to the time records, including those related to the motion for relief from stay.

[71]The court notes that the services provided by KCW, in this category and other categories, may have provided a benefit to Oak Grove.  Oak Grove presumably wished to stay informed.  Indeed, the work done by Kilmer appears to be the work of a competent bankruptcy practitioner.  However, the assertion that they are reasonable expenses related to the note rests on the incorrect assertion that Oak Grove had a right to enforce the loan documents on its own behalf, as a result of its acquisition of Midland Mortgage, rather than on behalf of Fannie Mae.  (See Defendants Exhibit 4).  To the extent Oak Grove may believe it had additional rights under the servicing agreement between it and Fannie Mae, it had the burden of proof on this issue, and failed to meet its burden, as the servicing agreement was not provided to the court.

b.   <u>DIP Financing, Plan, and Disclosure Statement</u>

Fannie Mae and Oak Grove assert that Bryan Cave billed 72.6 hours, for a total fee of $27,485.20, on the DIP financing motion; and 333.7 hours for a total fee of $143,086.40, on the plan and disclosure statement.  Fannie Mae and Oak Grove assert that KCW billed 6.5 hours, for a total fee of $2,567.50, on the DIP financing motion; and 171.2 hours, for a total fee of $65,518.00, on the plan and disclosure statement.

All of these services were billed after November 10, 2015, the date on which the instant adversary proceeding was filed.  A reasonable inference from the testimony of Aurzada is that, after counsel for Fannie Mae and Oak Grove determined the filing of the instant adversary proceeding to be an "act of war," they dramatically increased litigation activities and expenses, believing they could recover any costs from Debtor and its principals, and in order to try to obtain additional leverage in the instant Chapter 11 case.

The provisions to which Fannie Mae and Oak Grove continued to object in the DIP financing motion, plan and disclosure statement, were substantially similar to the provisions of the proposals to which they objected prepetition. That is, Fannie Mae and Oak Grove objected to a deposit of less than the full amount contained in the March, 2015 PNA, and objected to the funds being held by any entity other than Oak

121

Grove.  The court evaluates the reasonableness of the services
provided in light of the amount in controversy (a difference of
less than $150,000 between the $317,900 demanded and the $170,000
actual cost of repairs), and whether the position taken was
reasonable.  The court concludes that Fannie Mae and Oak Grove
pursued their postpetition course of action (at least until May,
2016) in bad faith for improper purposes:  trying to ensure that
they, and not Debtor, obtained the benefit of increases in value
of the property by destroying the LURA, and trying to make
Debtor's principals personally liable to improve the property to
the standard Johnson desired.[72]

The court has reviewed the KCW time records attached to
the 506(b) motion regarding the DIP financing motion, plan, and
disclosure statement.  Regarding the DIP financing motion, the
services of KCW appear primarily to be attending meetings between
Fannie Mae and its counsel.  The testimony of Kilmer does not
support another interpretation of the time records.  The court
concludes that these were not reasonable.  With respect to the
disclosure statement and plan, the time records reflect that
Kilmer reviewed the various documents, and prepared an objection
to confirmation.  Oak Grove's objection to confirmation raised

---

[72]The court notes that, in Texas real estate transactions, a
lender does not owe a borrower a duty of good faith.  See Central
Savings & Loan Ass'n v. Stemmons Northwest Bank, N.A., 848 S.W.2d
232 (Tex. App.--Dallas 1992).  However, the court considers the
lack of good faith pertinent in determining a reasonable fee.

nearly identical issues to those raised by Fannie Mae, and it is clear that Oak Grove personnel and counsel were working closely with Fannie Mae in Fannie Mae's assertion of its own position. The court concludes that these services were duplicative of those provided by counsel for Fannie Mae.  These services, together with Bryan Cave's services for Fannie Mae, increased the cost of litigation to Debtor.  It is a reasonable inference that Fannie Mae and Oak Grove sought to increase leverage and, since Fannie Mae deemed the filing of the instant adversary proceeding an "act of war," this radical cost increase was a warlike response.  The entirety of the proffered justification for KCW's participation on behalf of Oak Grove, separate from that of counsel for Fannie Mae, is the meritless argument that Oak Grove had a continued right to enforce the note on its own behalf as a result of having acquired Midland Mortgage after Midland Mortgage conveyed all its rights under the loan documents to Fannie Mae. The court concludes that Fannie Mae and Oak Grove have not met their burden of proof to show that the time records of KCW in this category reflect billing for services which were not duplicative, and were reasonable under the circumstances of the case.  The court concludes that the appropriate deduction from the time records of KCW, with respect to the DIP financing motion, and the plan and disclosure statement, is $68,085.50.

The court has reviewed the Bryan Cave time records regarding the DIP financing motion, plan, and disclosure statement.  A large portion of the time spent was objectively reasonable.  However, until May, 2016, the time records reflect efforts to defeat any measure proposed by Debtor, and to gain leverage.  The court concludes that the appropriate deduction from the time records of Bryan Cave, with respect to the DIP financing motion, and the plan and disclosure statement, is $8,624.00.

With respect to fees billed for litigation of the instant adversary proceeding, in the absence of prevailing on a breach of contract, thus entitling fees, those fees are not reasonably costs of collecting the note or enforcing loan documents.  The court concludes that the appropriate deduction from the time records of Bryan Cave is $64,993.40, and the appropriate deduction from the time records of KCW is $56,723.00, with respect to the instant adversary proceeding.

In addition to the matter-specific deductions, there are several other deductions in order to arrive at the reasonable costs billed by Bryan Cave and KCW to Fannie Mae.  First, Bryan Cave billed 39.1 hours, for a total fee of $16,052.90, for non-working travel between Bryan Cave's offices in Dallas and the court in Houston.  A reasonable treatment of non-working travel time, taking into consideration both the necessity of travel

where counsel is out of town and the parties' choice of counsel, is to allow billing for half the travel time.  The court concludes that the appropriate deduction for non-working travel is $8,026.45.  Second, the amount billed by Bryan Cave prepetition is not allowable under Section 506(b).  See In re Latshaw Drilling, LLC, 481 B.R. 765 (Bankr. N.D. Okla. 2012); In re Leatherland Corp., 302 B.R 250 (Bankr. N.D. Ohio 2003).  The appropriate deduction for prepetition billing is $15,181.70.  Third, Bryan Cave's time records reflect $6,111.60 billed on litigation against guarantors.  That amount is not allowable as a reasonable expense as against Debtor.  The appropriate deduction for litigation against guarantors is $6,111.60.  Fourth, there is a Bryan Cave line item on February 2, 2016 for preparation for the 341 meeting.[73]   The court takes judicial notice that the 341 meeting occurred on September 24, 2015.  The appropriate deduction is $611.80.

The court concludes that the reasonable fee for services billed by Bryan Cave is $248,817.00.[74]   The court

---

[73]The meeting of creditors pursuant to Section 341 of the Bankruptcy Code.

[74]This amount represents the $375,412.00 billed, less the deductions of $23,046.05 (motion for relief from stay), $8,624.00 (DIP financing, plan and disclosure statement), $64,993.40 (adversary proceeding), $8,026.45 (non-working travel), $15,181.70 (prepetition amount), $6,111.60 (litigation against guarantors) and $611.80 (incorrect 341 billing).

concludes that the reasonable fee for services billed by KCW is $8,131.50.[75]

### 2.   Expert Witness Fees

The invoices of Heigle and Kling are in evidence. (Windmill Exhibit 16 - 506(b), at p. 25-29).  The services described in those invoices appear reasonable.  The court concludes that the reasonable amount of expert witness fees is $33,064.59.

### 3.   "Miscellaneous Fees"

There is no evidence to support the $10,784.87 in miscellaneous fees.  The court concludes that they are not allowed.

### 4.   Postpetition Interest

There is no dispute that Fannie Mae is entitled to postpetition interest.  The parties dispute whether default interest should be allowed.

When an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest.  Whether the default rate or the pre-default rate should apply must be decided by examining the equities of the case.  Bradford v. Crozier (Matter of Laymon), 958 F.2d 72 (5th

---

[75]This amount represents the $137,166.50 billed, less the deductions of $4,226.50 (motion for relief from stay), $68,085.50 (DIP financing, plan and disclosure statement), and $56,723.00 (adversary proceeding).

Cir. 1992).  A default interest rate is generally allowed, unless
the higher rate would produce an inequitable result.  <u>Southland
Corp. v. Toronto-Dominion (Matter of Southland Corp.)</u>, 160 F.3d
1054 (5th Cir. 1998).

In considering the equities of the case, courts
consider, <u>inter</u> <u>alia</u>, (1) whether the spread between default and
non-default interest rates is large; (2) whether the over-secured
creditor was obstructing the bankruptcy process; (3) whether
junior creditors will be harmed if the over-secured creditor is
awarded default interest; and (4) whether the over-secured
creditor ever faced a realistic risk of nonpayment of its debt
either before or during the bankruptcy proceedings.  <u>In re Jack
Kline Co.</u>, 440 B.R. 712 (Bankr. S.D. Tex. 2010).

In the instant case, the four percent spread between
the default rate and the non-default rate is large, but not so
large as to be punitive.  The court concludes that this
consideration is neutral on the question of whether the default
interest rate should be allowed in the instant case.

Fannie Mae was obstructing the resolution process
through its tactics based both on its refusal to consider the
Debtor's prepetition position that Breen was willing to fund
repairs to the property as long as the funds were used for that
purpose, and also its determination that the filing of the
instant adversary proceeding was an act of war, that justified

127

its explosion of legal fees rather than negotiation, until May, 2016. The court concludes that this consideration weighs against the allowance of default interest.

The plan provides for payment in full of unsecured claims. The only harm to junior creditors appears to be a delay in payment. The court concludes that this consideration weighs in favor of the allowance of default interest.

The value of the property has been, at all times, significantly greater than the amount of the Debtor's debt secured by the property. Thus, there has never been a significant risk of nonpayment. The court concludes that this consideration weighs against the allowance of default interest.

In light of Fannie Mae's obstructionist approach, both prepetition and in the instant case until May, 2016, as well as the absence of a significant risk of nonpayment, the court concludes that default interest is not allowable as a component of Fannie Mae's postpetition claim under Section 506(b).

5.   Summary of 506(b) Claim

The court concludes that Fannie Mae's allowable postpetition claim under Section 506(b) is $308,338.42, consisting of $248,817.00 for the legal services of Bryan Cave; $8,131.50 for the legal services of KCW; expert witness fees of $33,064.59; and $18,325.33 in net postpetition interest, after application of the interest already paid postpetition.

128

Based on the foregoing, a separate conforming Judgment will be entered.

Signed at Houston, Texas on January 31, 2017.

_____
LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE